PEOPLE OF THE STATE OF NEW YORK ex rel. ARTHUR F. BRODERICK Relator, *v.* HENRY M. GOLDFOGLE et al., as Commissioners of Taxes and Assessments of the City of New York, Defendants.

Supreme Court, New York Special Term, July 15, 1924.

Taxation — moneyed capital — construction of Tax Law, as amended by Laws of 1923, chap. 897, providing for taxation of moneyed capital coming into competition with business of national banks — statute is constitutional and capable of application by tax commissioners subject to judicial review — relator, between whose firm and national banks actual rivalry exists, liable for tax — assessments of relators whose business capital does not compete with national banks void — difficulty of defining moneyed capital does not transmute ministerial duties of tax commissioners into legislative functions — delegation of power to tax commissioners to determine, in accordance with federal statutes, what constitutes business of national banks, valid — legislature may impose license tax upon occupations — statute not invalid for unreasonable classification — distinction based upon actual difference in use of moneyed capital described in statute proper and not arbitrary legislation — failure to appropriate for refunds of income tax contemplated by Laws of 1923, chap. 897, § 27, even if violative of State Constitution, art. III, § 21, does not invalidate entire statute — delay in enactment of statute does not constitute postponement of operation of whole act — proper test for imposition of tax is whether business does in fact compete — competition defined.

The provisions of the Tax Law, as amended by Laws of 1923, chapter 897, providing, in effect, for the taxation at the rate of one per cent of certain moneyed capital coming into competition with the business of national banks, and for exemption from other taxes, are constitutional and capable of application by tax commissioners subject to judicial review, since the power delegated to the tax commissioners is solely ministerial and does not differ in kind from many other functions intrusted to taxing authorities.

Accordingly, an assessment against a relator, the capital of whose firm is largely put out in loans identical in character with those appropriate to a national bank and between which there is actual rivalry, is valid, and a *prima facie* case was made out when evidence ·was presented indicating the actual competition and the amount of moneyed capital at the disposal of relator's business. However, assessments against relators, the capital of whose business does not compete with the national banks, are void and should be vacated.

The difficulty of determining whether property is moneyed capital and whether it does compete with the business of national banks does not transmute the ministerial functions of the tax commissioners into legislative functions.

It is not an improper delegation of power that the tax commissioners may be called upon from year to year to draw a conclusion of fact based partly on federal statutes as evidence, since the declared legislative intent may be applied by the commissioners to ·possibly shifting conditions, one of which may be the amendment of a federal statute.

A tax on business in competition with national banks is valid where its basis is the factual difference between competing moneyed capital and moneyed capital not in competition with banks, since it is unquestioned that the legislature may impose a tax on occupations.

The competitive use of moneyed capital is not a whimsical or irrational criterion of classification, for an accurate description of the property taxed fairly requires a statement of its use.

A distinction predicated upon the actual difference in the use of moneyed capital as a reasonable differentiating element is proper, cannot be condemned as arbitrary, and is within the state's right to discriminate under the police power for the purposes of taxation.

Assuming that the failure of chapter 897 of the Laws of 1923 to appropriate for the refunds of income tax contemplated by section 27 thereof violates section 21 of article III of the State Constitution, such an omission would at most invalidate the provision for the refund.

The delay in the enactment of the statute or the fact that it required certain reports to be filed on the day it became a law cannot postpone the operation of the whole act in the face of the enacting clause providing that it should become immediately effective and where there was abundant opportunity to the relators to assert their rights after the statute became effective. Nor was the delay violative of due process of law.

The test for the imposition of a tax under the statute is whether the business does in fact compete, not whether it is capable of an indirect and highly unsubstantial duplication of an isolated or non-characteristic activity. Competition means rivalry.

ACTIONS to vacate and set aside assessments made pursuant to chapter 897 of the Laws of 1923, amending the Tax Law, and providing in section 25, as amended, for the taxation of certain moneyed capital coming into competition with the business of national banks.

*John W. Davis, George A. Blauvelt, Martin Saxe, Franklin B. Lord, Michael F. Dee, Sherman Baldwin, George L. Shearer, McCready Sykes, Clifford Seasongood, Charles R. McSparren, William F. Unger, Carlyle M. Keyes, Walter C. Goodwin, John C. Ten Eyck, John H. Corwin, Joseph J. Zeiger, Arthur C. Rounds, George W.*

*Schurman, Jacob Gould Schurman, Jr., Bertram F. Wilcox, Henry M. Powell, Reginald F. Isaacs, Frank H. Richmond,* for the relators.

*Edward S. Greenbaum, Edward Seidman, Sullivan & Cromwell, Louis J. Vorhaus, amici curiæ.*

*George P. Nicholson,* corporation counsel (*William H. King* and *Eugene Fay,* of counsel), for the defendants.

PROSKAUER, J.　In 1922 the Court of Appeals held invalid the then existing statute purporting to tax stock of national banks because it violated the prohibition of the United States Revised Statutes, section 5219, page 1009, as amended, against taxation of national bank shares at a greater rate than that imposed on other moneyed capital.　*People ex rel. Hanover Nat. Bank* v. *Goldfogle,* 234 N. Y. 345. The legislature thereupon enacted chapter 897 of the Laws of 1923, amending the Tax Law, and providing in section 25, as amended, that " moneyed capital coming into competition with the business of national banks, * * * except bonds, notes or other evidences of indebtedness in the hands of individual citizens not employed or engaged in the banking or investment business and representing merely personal investments not made in competition with such business, shall be assessed at its actual value against the owners or holders thereof. * * *."

By other provisions (§§ 25b, 25c, as added by Laws of 1923, chap. 897) the rate is fixed at one per cent and the income of such competing moneyed capital relieved from income tax.　The proponents of this legislation also secured the passage by congress of an amendment to section 5219 of the United States Revised Statutes, limiting " moneyed capital " as follows: " * * * coming into competition with the business of national banks, * * * provided that bonds, notes or other evidences of indebtedness in the hands of individual citizens not employed or engaged in the banking or investment business and representing merely personal investments not made in competition with such business, shall not be deemed moneyed capital within the meaning of this section." See 42 U. S. Stat. at Large, 1499, chap. 267.

The object of the legislation was to permit the state effectively to tax national bank shares at one per cent.

The relators in this and eleven other proceedings challenge the constitutionality of the statute and its construction by the taxing authorities.

Conceding that it meets the requirements of section 5219 of the United States Revised Statutes, as amended, they urge that the

statute is too vague to be enforced without invalid delegation of legislative power to the tax commissioners; is based on unreasonable classification, and is, therefore, violative of article III, section 24 of the State Constitution, article I, section 6, of the State Constitution, and the Fourteenth Amendment of the Federal Constitution.

Referring to article III, section 24 of the State Constitution, requiring in tax statutes specification of rate, property and purpose, Earl, J., wrote in *Matter of McPherson,* 104 N. Y. 306, 319: " But we do not think that the policy embodied in the section had any reference to special taxes which may be collected in a variety of ways under general laws, such as auction duties, excise duties, taxes on business or particular trades, avocations or special classes of property. It has been held in several states where constitutional provisions required that property taxes should be equal and uniform, that such provisions had reference only to general, annual recurring taxes upon property generally, and not to special taxes upon privileges or special or limited kinds of property. * * * It was said by Finch, J., in *People* v. *Fire Association of Philadelphia* (92 N. Y. 311), that the tax covered by the constitutional provision is one general in its provisions and coextensive with the state. It is thus seen that there are cases where the language of this section of the Constitution must be restricted by construction, and we think this is one of them."

To hold this amendment to the general Tax Law violative of article III, section 24, would be contrary to this unquestioned authority and lay a precedent for invalidating many tax statutes in force and unquestioned for years.

Violation of the due process clause is first predicated on the difficulty of defining moneyed capital coming into competition with national banks and the consequent claim that application of the phrase cannot validly be left to taxing authorities. The course to be followed by tax commissioners will be hereafter discussed. On the constitutional point it suffices to say that the statute is capable of application by tax commissioners subject to judicial review. The claim that a tax statute improperly delegates legislative power is frequently made, rarely, if ever, upheld. Our court of last resort has recognized fully that, in the administration of the complex affairs of a great financial and industrial state, effectuation in detail of legislative intent must necessarily be committed to executive agencies.

In *Village of Saratoga Springs* v. *Saratoga G., etc., Co.,* 191 N. Y. 123, 138, Cullen, Ch. J., writes: " * * * while powers inherently and exclusively legislative cannot be delegated, there is a large field in which the legislature, to quote Chief Justice Marshall's

words, ' may certainly delegate to others powers which the legislature may rightfully exercise itself.' "

The power here delegated is solely ministerial. On the facts in each case the commissioners are to determine whether property is moneyed capital and whether it does compete with the business of national banks. This duty may differ in degree, but it does not differ in kind from many other functions intrusted to taxing authorities. The definitions requisite are difficult. But difficulty of definition does not transmute the ministerial function of the tax commissioners into a legislative one. Tax legislation equally difficult of application may be found in the franchise and corporation tax provisions of the Tax Law (§§ 181, 182, 184) and in numerous provisions of the income and excess profit provisions of the Tax Law.

It is also urged that the " business of national banks " is fixed by federal statute subject to amendment or repeal by congress and that the tax commissioners are, therefore, compelled possibly to re-legislate annually in accordance with the action of congress. Description of this duty as legislative is fallacious. To find what constitutes the business of national banks from year to year is to draw a conclusion of fact based partly on a federal statute as evidence. A declared legislative intent is to be applied to possibly shifting conditions, one of which may be the change of a federal statute. That this does not constitute improper delegation of power is demonstrated in the opinion of Finch, J., in *People* v. *Fire Assn. of Philadelphia,* 92 N. Y. 311, 317: " But it is argued that this act offends  *  *  *  by leaving the amount of the tax or fine to the legislative discretion of another State.  *  *  *  That is certain which can be rendered certain, and the act fixes the tax by reference to an extrinsic fact which determines its amount in excess of a fixed and established rate. Because that extrinsic fact is the legislation of another State, it does not follow that the legislative discretion of such other State is in any manner substituted for our own.  *  *  *  But if, when our statute was passed, there had been in existence a law of Pennsylvania, imposing upon New York companies a license fee of three per cent, and because of that fact our legislature had enacted that all Pennsylvania companies should pay a license fee of three per cent, would that law have been a delegation of legislative authority to the State of Pennsylvania? Most clearly not, although the fact of the foreign law lay at the foundation of our legislative judgment and discretion. And if, within a month, the foreign law changed the impost to four per cent, and our own legislature, again ascertaining the fact, and because of it should change our tax to four per cent, would that be Pennsyl-

vania legislation and not our own? And what would be certainly constitutional if done *seriatim*, by several and separate acts, does it become unconstitutional when the same precise and identical result, founded upon exactly the same legislative discretion, is accomplished by one? If so, a grave constitutional question is made to turn upon the bare form instead of the substance of legislative action. It seems to us that the whole difficulty arises from a failure to regard the foreign law, relatively to our own legislation, as simply and purely an extrinsic and contingent fact. Such fact, like any other, may justly influence and even occasion legislative action, without at all changing its nature, destroying its discretion or abridging its duties or its judgment. Most laws are made to meet future facts."

For similar legislation compare 1 Cooley Taxation (4th ed. § 79, n. 85); 8 Fletcher (Cyc. Corps, § 5759); *People ex rel. Standard Oil Co.* v. *Law*, 237 N. Y. 142, 146; *People ex rel. Barcalo Mfg. Co.* v. *Knapp*, 227 id. 64, 71, construing art. 9-A of the Tax Law (added by the Laws of 1917, chap. 726, as amd. by Laws of 1918, chap. 276), § 209; *Field* v. *Clark*, 143 U. S. 649, 692, and Tariff Act of September 21, 1922 (42 Stat. 941, 946, chap. 356).

Unreasonable classification is claimed, based on the contention that moneyed capital not in competition with national banks cannot validly be favored as against competing moneyed capital. Analysis of cited authorities on this subject is futile. The principles are simple; their application difficult. It is unquestioned and unquestionable that the legislature may impose a license tax upon occupations. There would be basis in fact for such a tax on business in competition with national banks. Here the legislature has used this very factual difference as one of the criteria of classification in the imposition of a property tax. The test is reasonableness.

Judge Vann, in *People ex rel. Farrington* v. *Mensching*, 187 N. Y. 8, 18, writes: " While the legislature has wide latitude in classification, its power in that regard is not without limitation, for the classification must have some basis, reasonable or unreasonable, other than mere accident, whim or caprice. There must be some support of taste, policy, difference of situation or the like, some reason for it, even if it is a poor one. While the state can tax some occupations and omit others, can it tax only such members of a calling as have blue eyes or black hair? We have said it could tax horses and leave sheep untaxed, but it does not follow that it could tax white horses and omit all others, or tax the sale of certificates printed on white paper and not those on yellow or brown. While one class may be made of horses and another of sheep, or even a class made of race horses, owing to the use made of them, without

a shock to common sense, a classification limited to white horses would be so arbitrary as to amount to tyranny, because there would be no semblance of reason for it."

The competitive use of moneyed capital is not a whimsical nor irrational criterion of classification. Accurate description of property fairly requires statement of its use. Few property taxes have been imposed on this basis. So far as briefs and research indicate, however, they have all been sustained. In *McHenry* v. *Alford*, 168 U. S. 651, 666, the court sustained the validity of a law providing for higher taxation of the lands of the Northern Pacific railroad (a federal corporation) than that of other lands in the state. This was a property tax because under *Railroad Co.* v. *Peniston*, 85 U. S. 5, 35, a state could not tax the operation of a federal corporation. Mr. Justice Peckham writes: " While we agree that property of the same kind and under the same condition and used for the same purpose cannot be divided into different classes for purposes of taxation and taxed by a different rule simply because it belongs to different owners, yet, where the situation and the possible use and the present condition of the ownership of lands are wholly different, such as they are in this case, from ordinary ownership, a classification is not arbitrary nor unreasonable which places such lands outside the class of lands owned in the ordinary way by individuals."

Similarly, no distinction in taxation could be made between moneyed capital of identical kind used in the same way by different owners. But a distinction can be made based upon actual difference in use of moneyed capital described in the statute for effectuation of a proper legislative purpose. In *Knisely* v. *Cottere*, 196 Penn. St. 614, 630, Mitchell, J., considering a tax discriminating between wholesale and retail dealers, writes: " Even regarding it as a tax based upon property directly, it could be sustained as a classification according to the use and purposes for which the property is held."

In *Citizens' Telephone Co.* v. *Fuller*, 229 U. S. 322, 326, certain co-operative telephone lines were exempted from taxation while ordinary telephone lines were taxed. The attack on the statute was on the ground that " the business is not taxed  *  *  *. It is the property used in the business, and it is all of like kind and used for like purposes, and each dollar's worth should be treated alike."

Mr. Justice McKenna writes: " This being the insistence of appellant, that is, that the tax is on property simply, appellant makes the property, dollar for dollar, the only basis of comparison between the taxed companies and the exempt companies.  *  *  * "

After reviewing the authorities relating to the state's right to

discriminate under the police power he continues (at pp. 329, 331): " * * * in taxation there is a broader power of classification than in some other exercises of legislation. * * * Granting the power of classification, we must grant government the right to select the differences upon which the classification shall be based, and they need not be great or conspicuous. * * * The state is not bound by any rigid equality. * * * The use of the untaxed property, as pointed out by the District Court, is ' predominantly private, while the use of the taxed property is correspondingly public; the exempt property is used for the personal convenience of the owners, while the taxed property represents commercial investment for profit making purposes.' "

While in the cited cases the difference in use may be more marked than in the case at bar, none the less the Supreme Court here clearly recognizes the propriety of including the use of property as a reasonable differentiating element.

As stated in 1 Cooley on Taxation (4th ed. § 335, p. 717): " Difference in the use of property as well as inherent differences in the kind of property, may be the basis of classification."

The statute relating to convict-made goods condemned in *People ex rel. Phillips* v. *Raynes*, 136 App. Div.. 417; affd., 198 N. Y. 539, cited by relators, turned not upon the use of property, but upon the accident of its origin.

A legislative purpose to relieve from taxation the investment of individuals representing the savings of thrift and industry, while subjecting to taxation similar capital employed in a definite business enterprise competing with the business of a national bank, cannot be condemned as arbitrary.

The failure of the statute (Laws of 1923, chap. 897) to appropriate for the refunds of income tax contemplated by section 27 thereof is claimed to be a violation of section 21, article III, of the State Constitution. Assuming, without deciding, the validity of this contention, such omission would at most invalidate the provision for refund. It is clearly severable from the essential provisions of the statute.

Relators claim that the statute does not apply to the year 1923. It provided a penalty for failure to file a statement by June first. It became a law on June first. The requirement that reports be filed on June first was for the assistance of the tax commissioners. It was not essential to the preservation of due process of law. The delay in enactment of the law might constitute a defense to an action for the penalty. It cannot postpone operation of the whole act in the face of the enacting clause, which provided that it should take effect immediately. The statute is part of the General Tax

Law. It provided that assessment rolls were to be made up as of August first. The third Tuesday of August was made the grievance day. Abundant opportunity was thus afforded to the relators to assert their rights after the statute became effective. That the taxable status was fixed as of a time antedating the date on which the law became effective does not indicate intent to postpone the operation of the law. As Mr. Justice Field said in *Locke* v. *New Orleans*, 4 Wall. 172, 173: " In the first place the act was not subject to the imputation of being retrospective. It did not operate upon the past, or deprive the party of any vested rights. It simply authorized the imposition of a tax according to a previous assessment." *People* v. *Spring Valley Hydraulic Co.*, 92 N. Y. 383; 2 Cooley Taxation (4th ed.) 1157.

The statute must be construed with its purpose and its judicial history in mind. Its adoption of the words of the federal statute, the discussion attendant upon its enactment and that of the federal amendment in 1923, and the fair intendment of its language indicate an unquestioned purpose to impose no broader tax than that required by the federal statute to validate the taxation of national bank shares.

The construction of the federal statute, therefore, is a potent guide in the construction of the state statute.

In *Mercantile Bank* v. *New York*, 121 U. S. 138, 155, Mr. Justice Matthews writes: " The main purpose, therefore, of Congress in fixing limits to state taxation on investments in the shares of national banks, was to render it impossible for the state, in levying such a tax, to create and foster an unequal and unfriendly competition, by favoring institutions or individuals carrying on a similar business and operations and investments of a like character. The language of the act of Congress is to be read in the light of this policy."

Though the statute then did not contain the 1923 amendment limiting the words " moneyed capital " to that engaged in competition with the business of national banks, Mr. Justice Matthews (at p. 156) continues: " The business of banking, as defined by law and custom, consists in the issue of notes payable on demand, intended to circulate as money where the banks are banks of issue; in receiving deposits payable on demand; in discounting commercial paper; making loans of money on collateral security; buying and selling bills of exchange; negotiating loans, and dealing in negotiable securities issued by the government, state and national, and municipal and other corporations. These are the operations in which the capital invested in national banks is employed, and it is the nature of that employment which constitutes it in the eye of this statute ' moneyed capital.' Corporations and individuals

carrying on these operations do come into competition with the business of national banks, and capital in the hands of individuals thus employed is what is intended to be described by the act of Congress."

Interpreting this language in *First Nat. Bank of Wellington* v. *Chapman*, 173 U. S. 205, 214, Mr. Justice Peckham writes: " The result seems to be that the term ' moneyed capital,' as used in the federal statute, does not include capital which does not come into competition with the business of national banks, and that exemptions from taxation, however large, * * * for reasons of public policy and not as an unfriendly discrimination against investments in national bank shares, cannot be regarded as forbidden by the federal statute."

In 1921 the Supreme Court in *Merchants' Nat. Bank* v. *Richmond*, 256 U. S. 635, 639, held invalid an ordinance of the city of Richmond purporting to tax national bank shares because it failed to tax competing moneyed capital. The state courts made no finding of fact as to whether a large amount of definite classes of moneyed capital did or did not compete with the business of national banks and attempted to limit the federal statute to the prevention of state discrimination in favor of state banking associations against national banking associations. Mr. Justice Pitney wrote: " By repeated decisions of this court, dealing with the restriction here imposed, it has become established that while the words ' moneyed capital in the hands of individual citizens ' do not include shares of stock corporations that do not enter into competition with the national banks, they do include something besides shares in banking corporations and others that enter into direct competition with those banks. They include not only moneys invested in private banking, properly so called, but investments of individuals in securities that represent money at interest and other evidences of indebtedness such as normally enter into the business of banking."

This language must be read in connection with prior decisions and subsequent congressional action. The case holds merely that on the facts there presented there was untaxed capital engaged in competition with national banks. It does not question the established rules that the determination of what constitutes capital engaged in competition with a national bank is a question of fact and that the capital to be taxed is that which substantially and actually competes with the business of a national bank.

It is argued by one of the relators that the language of this opinion imposes on respondents the duty to assess every bond, note or other evidence of indebtedness; that the failure so to do, pursuant to a fixed purpose, constituted an arbitrary discrimination

in the imposition of the levy, and that, therefore, this levy (as distinguished from the statute itself) must be held void. The commissioners somewhat inconsistently urge that they were justified in deliberately omitting the assessment of such property in the hands of ordinary individuals and investors, but may assess it in the hands of individuals engaged in any business approximating, however remotely, a banking business. Both contentions are unwarranted.

The debate in 1923, when the phrase qualifying "moneyed capital" was added to the federal statute, is illuminating. Representative Wingo, after the conference between senate and house committees, stated: "However, we all agree that in view of the uncertainty and the differences of opinion that have been created by this Richmond decision, it is wise to restate the law. * * * We take the position that it is easy to override the contention of the Richmond case by restating the old rule, with such additional language as will show that it is the intention of Congress in the new statute to follow the rule laid down in the old line of decisions * * *." Congressional Record, vol. 64, p. 4802, 67th Congress, part V, Feb. 27, 1923.

Senator Kellogg then stated: "My object in introducing the original bill, which said that the rate should not be higher than that on all moneyed capital engaged in banking, was to get away from the provisions of state laws that made the basis of taxing national banks the individual credits in the hands of the citizen. The House has attempted to get by that by providing that these investments in the hands of individuals shall not be deemed moneyed capital engaged in banking. I think myself it is rather a cumbersome provision; but we cannot get anything else, and I think it is better to accept it than to get no law at all." Congressional Record, vol. 64, p. 4959, 67th Congress, part V, March 1, 1923.

Reading the amendment in the light of this discussion it seems clear that congress intended to continue and emphasize the rule that the restrictive provisions of the federal statute did not apply to moneyed capital, in the hands of individuals, which in no substantial sense actually competes with the business of national banks.

This question of fact must be determined by actualities. It is not the business of a national bank, either by statute or in fact, to invest or deal in corporate bonds. They invest surplus funds in corporate bonds as a mere incident to the banking business, exactly as they may rent offices in a banking building to others. An individual who invests in corporate securities no more competes with "the business" of a national bank than does the landlord of an adjoining office building. The occasional investor in short time notes possesses property fairly described in the proviso exempt-

ing bonds, notes or other evidences of indebtedness in the hands of individual citizens not engaged in the banking or investment business and representing merely personal investments not made in competition with such business.   That proviso expresses the original implication of the statute as declared in the *Mercantile Bank* case to permit the states full freedom to exempt any property from taxation so long as the exemption does not result in real unfair and unfriendly competition with national banks.   Thus persons engaged in the business of buying and selling negotiable paper of the kind which national banks are permitted to deal in possess property subject to this tax.   Other cases will no doubt disclose other forms of competing business.   The test must be whether the business does in fact compete, not whether it is capable of an indirect and highly unsubstantial duplication of an isolated or non-characteristic activity.   Abstractly many widely different businesses may be regarded as potentially competitive.   If the price of wheat rises too high, substitutes therefor will be used.   Yet the dealer in some less desirable grain is not in reality a competitor with the dealer in wheat.   Every person who invests his savings at interest is in some remote sense lending money, which as a mere possibility might otherwise be loaned by a national bank.   The very depositor in the national bank itself is lending money to the bank, often at interest, but such persons do not actually compete for business with a national bank.

" Competition means rivalry." *First Nat. Bank* v. *Anderson,* 192 N. W. Rep. (Ia.) 6, 15.   The ruling of the Wisconsin state tax commission, interpreting a similar statute of that state and the 1923 federal amendment, convincingly emphasizes the necessity of this practical point of view.   They write: " The purpose of both enactments was to restore the method of assessing bank stock which had prevailed for a period of fifty years prior to the decision in the Richmond case and exclude private loans and investments from moneyed capital with which banks must be compared.   *  *  * Other individuals and organizations engaged in the securities, investment and loaning business under the laws of this state are sharply differentiated from organizations engaged in banking. None of them are organized as banks or allowed to do a banking business.   In so far as they compete with banks at all the competition is incidental and limited, and it is believed that none of them can encroach on the main functions of banks or use moneyed capital in competition with them within the meaning of the federal statute.   *  *  * Building and loan associations, securities and investment companies, automobile finance organizations, bond brokers and dealers, pawnbrokers and chattel mortgage loan concerns are not required to be assessed as banks."

Applying these tests to the cases to be determined, relator Pratt owns moneyed capital in competition with national banks. His firm enjoys the use of deposits aggregating nearly $5,500,000. The capital is largely put out in loans identical in character with those appropriate to a national bank. Between his firm and the national banks there is actual rivalry. He cannot escape taxation merely because it is not possible with mathematical precision to ascertain what portion of the moneyed capital is applicable to competitive and what to non-competitive business. The balance sheet of his firm must be analyzed to ascertain as exactly as may be the amount of competitive capital. Respondents make out a *prima facie* case for taxation when they show the actual competition and the amount of moneyed capital at the disposal of that competitive business. Certain items are clearly to be eliminated. If there be any ground for eliminating other items, it was primarily and peculiarly within the knowledge of relator and evidence to that effect should have been adduced by him. Certain of the assets are corporate stocks. While a national bank cannot buy and own corporate stock, it does not follow that a competitor, not subject to this prohibition, may not use this form of capital in competition with a national bank. It would defeat the purpose of the statute to permit a competitor to invest his reserves in corporate stocks, actually using them (or the loans made against them) to compete directly with a national bank, and by this indirection evade the mandate of congress. The total assets of the firm were $6,726,-419.72; its total liabilities were $6,214,796.70. From each of these amounts must be deducted the amount of the deposits — $5,496-550.22. From the assets must further be deducted the amount of tax exempt securities, $503,000, and under the stipulation (that the amount of indebtedness applicable to each item in the balance sheet is ninety-two and thirty-nine one-hundredths per cent of such item) there must further be deducted from the liabilities side that percentage of $503,000, or $464,721.70. There should also be deducted from the assets the value of the Stock Exchange seat, $93,000. A Stock Exchange seat is not capital competitive with the business of a national bank. It does not represent the investment of reserve funds. It confers a right to earn commissions for transacting business forbidden to national banks. It is wholly unrelated to the business of a bank. Deducting this $93,000 from the assets requires a corresponding deduction of ninety-two and thirty-nine one-hundredths per cent of that amount from the liabilities. The resultant computation leaves assets of $633,869.50 and liabilities of $167,602.08. The amount of competitive capital of the firm thus taxable is $466,267.42. Relator's share of this is thirty-

two per cent and the assessment will be reduced and confirmed against the relator for this amount, $149,205.57.  While this is slightly more than the amount stated on page 4 of the city's brief, attention of counsel is called to the fact that there is a mathematical error in the city's computation of thirty-two per cent of $482,244.72. There is no showing by the relator that any of the accounts receivable or loans are mere incidents to brokerage transactions, and I have, therefore, made no deductions for this reason.

The assessments in the other cases before me must all be voided.

In the *Talcott* case the relator is a textile factor.  It makes no loans.  It advances against merchandise and participates in the handling, storage, selling and collection of payment for the merchandise in return for a commission.  It operates under time contracts, requiring a continuous account current.  It has no recourse to the owner of the merchandise until resort has been first had to the merchandise itself.  *Newburger-Morris Co.* v. *Talcott,* 219 N. Y. 505, 511; *Gihon* v. *Stanton,* 9 id. 476, 481.  Its business has not the slightest similarity to that of a national bank.

The Equitable Pledge Society, Inc., is a pawnbroker.  It has no recourse at all against the person to whom it makes advances.  It must look solely to the pledged property for reimbursement. *Stephens* v. *Simpson,* 94 App. Div. 298; *Bernstein* v. *Weinstein,* 104 id. 615.  Just as a bank is prohibited from doing a pawn-broking business (*Nat. Bank* v. *Graham,* 100 U. S. 699, 704), so a pawnbroker cannot do a banking business.  *City of Chicago* v. *Hulbert,* 8 N. E. Rep. (Ill.) 812, 814.  The method by which its business is conducted, the nature of its patronage, the statutory restrictions and privileges governing its transactions so differentiate it from a national bank that a finding of actual rivalry would seem grotesque.

The Bankers Commercial Securities Co., Inc., purchases from dealers, who buy from manufacturers, conditional sale contracts, leases and chattel mortgages on automatic piano players, calling for weekly or monthly installments over an average period of thirty months; the payments average about twelve dollars and fifty cents a month on each transaction.  This is not the acquisition of evidences of indebtedness which " normally enter into the business of banking."  *Merchants' Nat. Bank* v. *Richmond,* 256 U. S. 635, 639.

The Bankers Loan and Investment Company is a building and loan association.  Its object is to " encourage industry, frugality, home owning and the saving of money by its members, the accumulation of savings and the loaning thereof to its members," as authorized by the New York statute.  It conducts the conventional business of a building and loan association.  It approximates closely to a

savings bank, of which Mr. Justice Matthews in *Mercantile Bank* v. *New York*, 121 U. S. 138, 161, says: " No one can suppose for a moment that savings banks come into any possible competition with national banks of the United States. They are what their name indicates — banks of deposit for the accumulation of small savings belonging to the industrious and thrifty. To promote their growth and progress is the obvious interest and manifest policy of the state."

The national bank certainly needs no protection against the activities of an association intended to aid small investors by thrift to accumulate from their savings sufficient money to build a home. *First National Bank of Glendive* v. *Dawson County*, 213 Pac. Rep. 1097.

Peabody, Houghtaling & Co. are engaged in the business of buying and selling complete issues of corporate bonds secured by real estate mortgage. This is not any part of the business of a national bank. In Morse on Banks and Banking (5th ed., vol. 1, § 59, and note 4) it is stated: " In this country the general rule is, that any bank may loan on the security of stocks or bonds of other corporations, but cannot buy and sell them    *    *    *. It is no part of the banking business to engage in ' traffic in ' merchandise or financial securities."

And in section 71-c it is stated: A bank cannot " traffic in merchandise, stocks or securities."

And at section 77: " It has been held not to be incidental to the banking business, nor an implied power pertaining to a bank, to buy or sell stocks or bonds."

A bank which lends money at interest on the security of bonds is not the rival of a dealer who purchases bonds merely for the purpose of reselling them to investors.

The other relators are all stockbrokers.

Exton is a floor trader who buys and sells on his own account solely. He makes no loans and competes with a national bank no more than if he bought or sold tangible merchandise instead of corporate stocks.

Berdan and Carlisle are members of firms which deal in odd lots, that is, stock in smaller amounts than 100 shares. Benkard, Bonner and Broderick are engaged in the conventional business of general stockbrokers. The actual business of these relators is to buy and sell securities on commission. No national bank can or would engage in their fundamental activity. As an incident to their business they make advances to their customers on the securities purchased for their account. The mode of transacting this business is thoroughly established and general. The stockbroker, trading for his customer, to facilitate the trade advances a cer-

tain percentage of the purchase price, the customer putting up a so-called margin to protect the broker. The broker in turn repledges these securities to a national bank or similar institution for an amount smaller than that which the broker advances to the customer, thus giving the national bank an additional margin of security. These brokers not only do not compete with national banks, but actually supply them with a very substantial portion of their business. The advances made by the brokers are not such loans as the banks would make to the customers, nor are they made directly as loans. They constitute the device by which the broker increases his own earning of commissions.

The capital of these relators, therefore, does not compete with the business of a national bank.

Ordered accordingly.