## MERCHANTS' NATIONAL BANK OF GLENDIVE, APPELLANT, *v.* DAWSON COUNTY, RESPONDENT.

(No. 7,070.)

(Submitted January 3, 1933. Decided January 21, 1933.)

[19 Pac. (2d) 892.]

*Mr. Frank Woody* and *Mr. P. F. Leonard,* for Appellant, submitted a brief; *Mr. Woody* argued the cause orally.

*Mr. L. A. Foot,* Attorney General, *Mr. L. V. Ketter,* Assistant Attorney General, and *Mr. F. S. P. Foss,* County Attorney of Dawson County, submitted a brief; *Mr. Ketter* argued the cause orally.

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

Plaintiff, a national banking association of Glendive, Dawson county, brought this action to recover taxes paid by it for the year 1929 under protest. In general, it charges that the applicable laws exact from it taxes on shares of its stock at rates higher than from that of competing moneyed capital, contrary to section 5219 of the Revised Statutes of the United States, as amended (12 U. S. C. A., sec. 548).

It concedes that the assessing officers properly valued its shares of stock for assessment purposes under section 2066, Revised Codes of 1921, and Chapter 64, Laws of 1929, but charges that under the law competing moneyed capital is taxed on the basis of 7 per cent. of its value; whereas its shares are taxed on the basis of 30 per cent. of their value, so that there is produced the unequal taxation complained of. It paid the entire tax assessed against its shares of stock, but the difference between what the tax would have been, if computed on the basis of 7 per cent., and the amount actually assessed, was paid under protest, and the alleged excess is sought to be recovered by this action.

The trial court found all of the issues against plaintiff, and entered judgment for defendant. Plaintiff appealed from the judgment.

In its complaint, plaintiff charges that building and loan associations during the year 1929 employed capital, substantial in amount, in direct and active competition with plaintiff in the county in which plaintiff engages in the banking business. This was put in issue by the answer.

The record shows that on the first Monday in March, 1929, plaintiff had invested in loans and discounts, $480,186.19; in bonds and warrants, $352,598.85; in United States bonds, $101,050; had checking and time deposits of $510,252.05, and savings deposits of $66,403.23.

The evidence shows that on the first Monday in March, 1929, there were twenty-six building and loan associations, including the Glendive Building & Loan Association, doing business in the state; that, from the statement filed by the Glendive Building & Loan Association with the county assessor, it appears that it had loans on real estate secured by mortgages amounting to $197,867.28, loans on stock certificates and pass-books $2,050, and deposits in banks amounting to $2,956.57.

A statement was introduced in evidence showing the resources and liabilities of all twenty-six associations in the state. It is sufficient to say that the statement shows that these associations have resources in substantial amount.

There was evidence that some of these associations, in addition to the Glendive Association, made loans in Dawson county. Thus it was shown that the United States Association of Butte held twenty-seven real estate mortgages on property situated in that county on the first Monday of March, 1929, securing loans aggregating $38,440, and the Security Association of Billings held fifty-seven mortgages on real estate in Dawson county, securing loans aggregating $183,550. There was introduced in evidence a mortgage on real estate in Dawson county given to the Security Building & Loan Association to secure a loan of $30,000, which, the evidence shows, covered property used for an apartment house and garage. There was evidence of another mortgage to the same association, securing a loan of $5,000 and covering business property in Dawson county used as a furniture establishment and photograph gallery. A third mortgage securing a loan in the sum of $5,000 to the same association covers real property in Dawson county used as business property. The loan was not made for the purpose of constructing a new building, but simply as a secured loan. A number of like loans were made

by the associations on business property situated in Custer county.

The record shows that three classes of stock are issued by Montana building and loan associations, viz., installment, prepaid and fully paid stock. On installment and prepaid stock, the dividends earned and apportioned are not paid over to the shareholder, but are credited to the stock on the books of the association. The dividends on the fully paid stock are paid to the owners when the dividends are declared.

The Glendive Association had outstanding installment stock amounting to $82,418 and fully paid stock amounting to $93,300, and the owners of about $47,000 of this stock had borrowed money from the association. The twenty-six associations together had in the year 1929 outstanding loans of about $16,500,000 to holders of about $13,500,000 of installment stock, and loans of about $265,000 to holders of $3,375,900 fully paid stock, and $1,275,000 prepaid stock.

The contention of the plaintiff bank is that the owners of the fully paid and prepaid stock of building and loan associations, by becoming the owners of such stock, have made investments the same as purchasers of bank stock, and that the investments are of moneyed capital for the purpose of obtaining earnings thereon by way of dividends, the same as investments in bank stock; or, if not, that they have become depositors of funds on which they receive interest by way of dividends, the same as savings deposits in a bank, and that the associations are in competition with the banking business.

Plaintiff's contention is that building and loan associations are favored in matters of taxation over national banks. The contention that there is unlawful discrimination cannot be sustained.

Section 5219, supra (12 U. S. C. A., sec. 548) as in force in ▮ 1929, sanctioned state taxation of shares of stock of national banks, subject to the restriction that "the tax imposed shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such state coming into competition with the business of national

banks: Provided, That bonds, notes, or other evidences of indebtedness in the hands of individual citizens not * * * engaged in the banking or investment business and representing merely personal investments not made in competition with such business, shall not be deemed moneyed capital.''

It is sometimes difficult to determine when moneyed capital comes into competition with the business of national banks within the meaning of this section. In *Mercantile Nat. Bank* v. *New York,* 121 U. S. 138, 7 Sup. Ct. Rep. 826, 30 L. Ed. 895, it was held that this section embraces shares of stock or other interests owned by individuals in enterprises in which the capital used in the business is money, and where the object of the business is the making of profit by its use as money.

In *First Nat. Bank* v. *Anderson,* 269 U. S. 348, 46 Sup. Ct. Rep. 135, 138, 70 L. Ed. 303, the court said that competition exists where moneyed capital ''is employed, substantially as in the loan and investment features of banking, in making investments, by way of loan, discount or otherwise, in notes, bonds or other securities with a view to sale or repayment and re-investment.''

Again, in *First Nat. Bank* v. *City of Hartford,* 273 U. S. 548, 47 Sup. Ct. Rep. 462, 465, 71 L. Ed. 767, 59 A. L. R. 1, the court had this to say: ''But this court has recently had occasion, in reviewing the earlier decisions dealing with this subject, to point out that the requirement of approximate equality in taxation is not limited to investment of moneyed capital in shares of state banks or to competing capital employed in private banking. The restriction applies as well where the competition exists only with respect to particular features of the business of national banks or where moneyed capital 'is employed, substantially as in the loan and investment features of banking, in making investments, by way of loan, discount or otherwise, in notes, bonds or other securities with a view to sale or repayment and reinvestment.' * * * Competition may exist between other moneyed capital and capital invested in national banks, serious in character and therefore well within the purpose of section 5219, even though the com-

petition be with some but not all phases of the business of national banks. Section 5219 is not directed merely at discriminatory taxation which favors a competing banking business. Competition in the sense intended arises not from the character of the business of those who compete but from the manner of the employment of the capital at their command. * * * Our conclusion is that section 5219 is violated wherever capital, substantial in amount when compared with the capitalization of national banks, is employed either in a business or by private investors in the same sort of transactions as those in which national banks engage and in the same locality in which they do business.'' Of like import is the case of *State of Minnesota* v. *First Nat. Bank of St. Paul*, 273 U. S. 561, 47 Sup. Ct. Rep. 468, 470, 71 L. Ed. 774.

In the *Hartford Case,* the court pointed out that, in order to establish the fact of competition, it is not necessary to show that national banks and competing investors solicit the same customers for the same loans or investments, but that it is enough ''if both engage in seeking and securing in the same locality capital investments of the class now under consideration which are substantial in amount.'' And the court pointed out in that case that the evidence was uncontradicted as to the precise character of the competition, and that there was direct evidence that the business complained of came into competition with national banks.

In the *Minnesota Case* the court observed that ''there is direct evidence, also, that the investments of individuals in this type of security aggregating large amounts lessens the opportunity for the investment of capital by national banks. The only witness called by petitioner admitted that to some extent such competition existed. In this state of the record we think the findings of the state court are supported by the evidence.''

In the case before us, there is nothing in the record to show that plaintiff bank in 1929 was seeking the character of loans then held by building and loan associations. There is nothing in the record to indicate that the business conducted by the

building and loan associations lessened the opportunity of plaintiff bank to invest all the capital it desired and more.

"Competition" is defined as "the act or proceeding of striving for something that is sought by another at the same time; a contention of two or more for the same object or for superiority; rivalry as between aspirants for honors or for advantage in business." (Funk & Wagnalls Standard Dictionary.)

Here, so far as the record shows, the loans made by the building and loan associations upon security, in the vicinity of plaintiff bank, may have been made at the solicitation and because of the urgent demand of the plaintiff bank, in order to enable the debtor to discharge an obligation owing to the bank. In such a situation it would be preposterous to hold that the act of making the loans was done in competition with the business of the bank. Also, the mortgages which were introduced in evidence and which were for purposes other than home building, were made prior to the enactment of Chapter 62 and Chapter 64, Laws of 1929. Moreover, a building and loan association does not make loans with a view to a sale of the notes and re-investments, as in the investment features of banking, and hence its capital is not competing moneyed capital within the meaning of section 5219, supra (12 U. S. C. A., sec. 548). (Compare *Georgetown Nat. Bank* v. *McFarland*, 273 U. S. 568, 47 Sup. Ct. Rep. 467, 71 L. Ed. 779.)

A building and loan association is "a corporation, mutually operated, for the purpose of encouraging home building'and thrift among its shareholders, and loaning substantially all of its funds to them on real estate mortgage security." (Section 1, Chap. 57, Laws of 1927.) The state may, if it sees fit, favor such associations in levying taxes, as a matter of public policy, without such action being regarded as unfriendly discrimination against national banks. (*First Nat. Bank* v. *Dawson County*, 66 Mont. 321, 213 Pac. 1097; *Commercial Nat. Bank* v. *Custer County*, 76 Mont. 45, 245 Pac. 259; *Mercantile Nat. Bank* v. *Hubbard*, (C. C.) 98 Fed. 465,

affirmed in *Lander* v. *Mercantile Nat. Bank,* 186 U. S. 458, 22 Sup. Ct. Rep. 908, 46 L. Ed. 1247.)

Nor can the claim of plaintiff that this conclusion has been changed by the supreme court of the United States in *Commercial Nat. Bank* v. *Custer County,* 275 U. S. 502, 48 Sup. Ct. Rep. 155, 72 L. Ed. 395, which overruled the decision of this court (76 Mont. 45, 245 Pac. 259) be sustained. The supreme court of the United States was justified in reversing the holding of this court if any one of the alleged businesses involved in that case employed capital in substantial amount in competition with the business of the national bank. We are not at liberty to indulge in the speculation that, because of the reversal of the decision of this court by the memorandum opinion in 275 U. S. 502, 48 Sup. Ct. Rep. 155, 72 L. Ed. 395, the supreme court of the United States must be said to have held that all of the business enterprises therein involved were engaged in competition with national banks. This assumption on our part would be all the more unwarranted when we remember that the reversal was on the authority of *First Nat. Bank* v. *City of Hartford,* 273 U. S. 548, 47 Sup. Ct. Rep. 462, 71 L. Ed. 767, 59 A. L. R. 1, and *Minnesota* v. *First Nat. Bank,* 273 U. S. 561, 47 Sup. Ct. Rep. 468, 71 L. Ed. 774, neither of which makes mention of building and loan associations, though in the former, as shown by the reported decision in the state court (187 Wis. 290, 203 N. W. 721), building and loan associations were involved.

Building and loan associations are in many respects the same as savings banks. The law is well settled that capital invested in savings banks cannot be regarded as moneyed capital within the meaning of section 5219 of the federal statute. (*Mercantile Nat. Bank* v. *Hubbard,* supra; *Mercantile Nat. Bank* v. *New York,* 121 U. S. 138, 7 Sup. Ct. Rep. 826, 838, 30 L. Ed. 895; *Aberdeen Bank* v. *Chehalis County,* 166 U. S. 440, 17 Sup. Ct. Rep. 629, 41 L. Ed. 1069; *Davenport Nat. Bank* v. *Board of Equalization,* 123 U. S. 83, 8 Sup. Ct. Rep. 73, 31 L. Ed. 94; *National Bank of Redemption* v. *Boston,* 125 U. S. 60, 8 Sup. Ct. Rep. 772, 31 L. Ed. 689; *First Nat. Bank* v.

*Chapman,* 173 U. S. 205, 19 Sup. Ct. Rep. 407, 43 L. Ed. 669; *Hoenig County Treasurer* v. *Huntington Nat. Bank of Columbus,* (C. C. A.) 59 Fed. (2d) 479.)

In *Mercantile Nat. Bank* v. *New York,* supra, the court, in speaking of this question, said: ''No one can suppose for a moment that savings banks come into any possible competition with national banks of the United States. They are what their name indicates, banks of deposit for the accumulation of small savings belonging to the industrious and thrifty. To promote their growth and progress is the obvious interest and manifest policy of the state. Their multiplication cannot in any sense injuriously affect any legitimate enterprise in the community.''

A stockholder in a building and loan association does not own an interest in the capital and property of the corporation. He simply holds evidence of a money demand against the association. His right to have his demand paid does not depend upon dividends declared as in the case of the holder of shares in a banking corporation. A member of a building and loan association may, upon giving thirty days' notice, demand the payment of the obligation of the association to him, the same as the owner of a savings bank deposit in a savings bank. (Subd. 8, sec. 12, Chap. 57, Laws of 1927.)

While members of a building and loan association holding certificates of stock are stockholders for some purposes and in a certain sense (9 C. J. 936), yet, for purposes of taxation, they are merely the owners of a credit and are creditors of the association, and the association is their debtor within the meaning of sections 8598, 8599, Revised Codes 1921. The state may, in recognition of its duty to encourage the acquisition of homes by its citizens, exempt building and loan associations from the payment of any tax so far as the Fourteenth Amendment to the United States Constitution is concerned. (*Louisville Gas & Electric Co.* v. *Coleman,* 277 U. S. 32, 48 Sup. Ct. Rep. 423, 72 L. Ed. 770; *State ex rel. Bank of Eagle* v. *Leonardson,* 51 Idaho, 646, 9 Pac. (2d) 1028.) This may be done without infringing upon section 5219.

But were we to say that the moneyed capital of a building and loan association comes into competition with the business of national banks, still plaintiff cannot prevail here; for our taxing statutes do not operate to create an unfriendly discrimination in favor of the associations and against national banks and their stockholders. The statutes relating to the taxation of building and loan associations provide that such associations shall be taxed, first, upon their real property; secondly, upon their personal property, and, thirdly, upon their moneyed capital. (Chap. 62, Laws of 1929.) Their moneyed capital is ascertained "by deducting from the amount of bonds, notes and other evidences of indebtedness, including evidences of indebtedness secured by mortgage on real estate or personal property, of such associations, the amount standing to the credit of the members of any such association, upon its books, and any indebtedness representing money borrowed for use as moneyed capital." (Chap. 62, supra.) Its moneyed capital is, by the statute, taxed at the same rate and takes the same classification as shares of stock in a national bank or moneyed capital coming into substantial competition therewith. The statute also contains the following provision: "The amount standing to the credit of each member of any such association, upon its books, shall be considered and held as the individual credit of each member, and each member shall list the shares held by him for taxation, at their real value in money, in the county of his residence, the same as other credits are listed, except shares from which loans have been made, or money advanced, by the association, and as to such shares they shall be listed for taxation at the net cash value of the stock, to be ascertained by deducting the loan from the cash value of the shares. Associations organized under or controlled by this Act shall be subject to taxation in no other way."

The first contention of plaintiff is that, since all money belonging to building and loan associations is taxed on the basis of 7 per cent. of its value, while bank shares are taxed on the basis of 30 per cent. of their value, there is discrimination against shareholders of national banks. In order to

prevent our taxing scheme from coming into conflict with section 5219, supra (12 U. S. C. A., sec. 548), it is only necessary that such part of moneyed capital as competes with national banks be taxed on the same basis. If we assume that some capital of the building and loan association competes with that of a national bank, it would be contrary to well-known facts to say that all of it does. National banks are restricted in their loans upon real property to loans not exceeding five years. There is no such limitation upon building and loan associations. The mere showing that a building and loan association is the owner of money at the time taxes are assessed is not sufficient to show that such money is used in competition with the business of national banks. The money on hand at assessment time might be expended for salaries or expenses, or loaned in a field in which national banks are not permitted to operate. Moreover, if mere proof of ownership of money on hand at assessment time is sufficient to sustain the claim of the bank that it is in competition with the bank, still it cannot successfully be contended that there is unfriendly discrimination, unless the entire tax burden placed upon the bank stock is at a greater rate than that upon building and loan associations.

The only proof in this case with respect to cash on hand by building and loan associations in the vicinity in which the plaintiff bank is located and in which it conducts its business is proof of the fact that four building and loan associations had cash amounting to $1,138. The amount of this cash was so inconsequential that we cannot say it represents a substantial amount, as compared with the capital of the plaintiff national bank.

Also, national banks are permitted to deduct from their assets, including cash on hand, all their liabilities in arriving at their capital, surplus and undivided profits, whereas no deductions are allowed from cash on hand to building and loan associations. We cannot say, therefore, that the method of taxation, under the facts here shown, creates an actual unfriendly competition with the national . bank. (Compare

'Amoskeag Savings Bank v. Purdy, 231 U. S. 373, 34 Sup. Ct. Rep. 114, 58 L. Ed. 274.)

The next claim is that there is discrimination because, in determining the moneyed capital of building and loan associations, there is deducted from the amount of bonds and notes, and other evidences of indebtedness owned by them, the amount standing to the credit of the members of the association, while no such provision is made for deducting the amount owing by the bank to any of its shareholders. Substantial equality, however, is maintained by permitting the deduction of the liabilities of the bank in arriving at the full cash value of the bank shares.

The practical working of our statute relating to the taxation of building and loan associations is that the more they loan to their members, the greater is their moneyed capital assessable at 30 per cent., for, when a loan is made by the association to a member, it becomes the owner of an evidence of indebtedness taxed to it as moneyed capital on the basis of 30 per cent. of its value.

The next claim is that there is discrimination in that in determining the value of building and loan association stock the member is permitted to deduct from the amount standing to his credit on the books of the association the amount of money borrowed by him from the association, then remaining unpaid; whereas a shareholder of bank shares is not permitted to deduct from the value of his shares money borrowed by him from the bank remaining unpaid. The stock of a member in a building and loan association not representing moneyed capital coming into competition with the business of national banks, it is of no consequence what deductions are permitted by state law in arriving at its value, or whether like deductions are allowed bank shareholders. As we have said, a member of a building and loan association under the laws of this state stands in the same category as a depositor in a savings bank. In any event, plaintiff has not alleged that any of its stockholders were indebted to it, and hence is in no situation to contend that the taxing statute is invalid

for not allowing deductions to its shareholders. (*Supervisors of Albany County* v. *Stanley*, 105 U. S. 305, 26 L. Ed. 1052.) The only claim made in this case is that the statutes relating to the taxation of plaintiff's shareholders are invalid, and not that deductions should be allowable in favor of its shareholders.

Plaintiff also contends that it is discriminated against by the laws relating to the taxation of moneyed capital of insurance companies. By Chapter 63, Laws of 1929, ''all property other than credits of insurance companies required by law to have and maintain a legal reserve for the protection of policy-holders shall be assessed, classified and taxed as other property of like character. Credits, including evidence of indebtedness secured by mortgages, less legal reserves for the protection of policyholders and other indebtedness shall be classified and taxed on the basis of Thirty per centum (30%) of full cash value as thus ascertained.''

The only proof on this feature of the case is that domestic insurance companies owned money on the first Monday in March, 1929, without any showing that it came into competition with the business of plaintiff bank. True, there was evidence that the reserve of insurance companies, as well as a part of their capital, was invested in loans, secured by real estate mortgages, loans on policies held by policy-holders, in county, city and school district bonds, and other industrial and government bonds. The evidence shows that the Montana Life Insurance Company had on the first Monday of March, 1929, loans to the extent of $3,000 on lands in Dawson county, loans on notes to policy-holders of $1,874,577, and United States bonds amounting to $205,000; that it owned county bonds issued by twenty-three different counties amounting to $561,720, which included $25,000 of Dawson county bonds, school district bonds of $205,700, city bonds aggregating $174,260, and other bonds and securities worth in excess of $4,000,000. Its legal reserve required by law was $7,905,069. Its total investments in mortgage loans, bonds, and other securities was $8,200,000. Therefore to the extent

of $294,931 the investments in securities represented an investment of its capital. The Lewis and Clark Life Insurance Company had similar investments, but in smaller amounts.

But the record is barren of any testimony tending to show that the investments were made with a view to sale or repayment and re-investment so as to suggest that they were made in competition with the business of plaintiff, or any other national bank. The securities, from anything that appears in the record, may have been purchased by the insurance companies from national banks and at the latter's solicitation and in furtherance of the business of the bank. There is nothing in the record to show that these investments in any manner lessened the opportunity of plaintiff and other banks to invest all the money desirable in like securities. There was no proof that the capital of the insurance companies came into competition with the business of plaintiff bank.

Investments made by insurance companies, their assets, and the interest of individuals therein, are not moneyed capital coming into competition with national banks. (*National Bank of Redemption* v. *Boston,* 125 U. S. 60, 8 Sup. Ct. Rep. 772, 31 L. Ed. 689.)

The assertion is made that, because insurance companies with reserves are permitted to deduct the reserves in ascertaining the value of their credits without allowing a like deduction on the part of a national bank, prohibited discrimination results. It has generally been held that the reserve of an insurance company constitutes debts owing by the insurer to the insured. (*Alabama Gold Life Ins. Co.* v. *Lott,* 54 Ala. 499; *Equitable Life Ins. Co.* v. *Board of Equalization,* 74 Iowa, 178, 37 N. W. 141; *Hawkeye Ins. Co.* v. *Board of Equalization,* 75 Iowa, 770, 37 N. W. 966; *Michigan Mutual Life Ins. Co.* v. *Common Council of Detroit,* 133 Mich. 408, 95 N. W. 1131; *Newark* v. *State Board,* 81 N. J. L. 416, 79 Atl. 343.)

Since a national bank is permitted to deduct its liabilities in determining the value of its shares of stock, equality in taxation is maintained as against insurance companies by per-

mitting the latter to deduct their debts in computing their moneyed capital.

It is further contended that other corporations, aside from building and loan associations and insurance companies, are favored in taxation as against national banks, because no provision is made to tax their shares of stock when they have a value in excess of the property owned and assessed to the corporations. The answer to this contention is that the laws are adequate to require the taxation of the shares of stock of any corporation. (*Bank of Miles City* v. *Custer County,* ante, p. 291, 19 Pac. (2d) 885.) Also, plaintiff did not sustain the burden of proof resting upon it to show that these corporations employed moneyed capital in competition with its business. We find no basis for a finding that the district court erred in finding the issues in favor of defendant.

Plaintiff makes no claim, nor could it be maintained, that state banks are favored in matters of taxation over national banks. (Compare *Bank of Miles City* v. *Custer County,* supra.)

Chapters 62, 63 and 64, Laws of 1929, were designed to, and, we think, do place all moneyed capital competing with national banks on substantially an equal basis for the purpose of taxation.

What has been said with respect to section 5219, supra (12 U. S. C. A., sec. 548), also refutes plaintiff's contention that sections 2066 and 2067, Revised Codes of 1921, Chapter 64, Laws of 1927, and Chapter 64, Laws of 1929, violate the Fourteenth Amendment to the Constitution of the United States, as well as certain sections of the state Constitution.

"The equal protection clause does not require the state to maintain a rigid rule of equal taxation, to resort to close distinctions, or to maintain a precise scientific uniformity; any possible differences in tax burdens not shown to be substantial or which are based on discriminations not shown to be arbitrary or capricious, do not fall within constitutional prohibitions." (*Lawrence* v. *State Tax Commission of State*

*of Mississippi*, 286 U. S. 276, 52 Sup. Ct. Rep. 556, 559, 76 L. Ed. 1102.)

The next claim is that Chapter 64, Laws of 1929, conflicts with section 1 of Article VIII, and sections 1, 2, 11, 16 and 18 of Article XII, of the state Constitution. The basis of this claim is that Chapter 64 fails to do that which the courts have been unable to do, viz., prescribe a definite and certain guide by which to determine when moneys and credits do, and, when they do not, come into competition with the business of a national bank, and that in consequence it delegates to the assessing officer judicial powers. Like contention was under discussion by the court in *People* v. *Goldfogle*, 123 Misc. Rep. 399, 205 N. Y. Supp. 870, 873, where the court said: "On the constitutional point it suffices to say that the statute is capable of application by tax commissioners subject to judicial review. The claim that a tax statute improperly delegates legislative power is frequently made; rarely, if ever, upheld. Our court of last resort has recognized fully that, in the administration of the complex affairs of a great financial and industrial state, effectuation in detail of legislative intent must necessarily be committed to executive agencies. * * * The power here delegated is solely ministerial. On the facts in each case the commissioners are to determine whether property is moneyed capital and whether it does compete with the business of national banks. This duty may differ in degree, but it does not differ in kind, from many other functions intrusted to taxing authorities. The definitions requisite are difficult. But difficulty of definition does not transmute the ministerial function of the tax commissioners into a legislative one. Tax legislation equally difficult of application may be found in the franchise and corporation tax provisions of the Tax Law * * * and in numerous provisions of the income and excess profit provisions of the tax laws."

There is valid reason for the legislature not attempting to specify in detail what moneyed capital does, and what does not, compete with the business of a national bank. The permission granted by Congress to the states to tax national banks

is subject to change by Congress. "It [the legislature] had the right to make its classification and description of the property flexible, so that they would be adjustable to conditions thereafter arising, rather than that it was compelled to adopt a new statute every time that some change in the business to be transacted by national banks was made." (*People* v. *Goldfogle*, 242 N. Y. 277, 151 N. E. 452, 457.)

In the last-cited case the court, addressing itself to the same contention here made, said: "And then finally we come to the claim made by the relator that the phrase in the statute fixing the moneyed capital which is to be taxed as that 'coming into competition with the business of national banks' is also so general and indefinite as to furnish no sufficient guide to the taxing authorities and that the latter cannot tell what is meant by 'competition.' Again we disagree with the relator's contention and reach the conclusion that this definition of the capital to be taxed furnishes a sufficiently definite rule for the guidance of assessors, although, of course, realizing that at times there may be difficulty in determining whether the facts of a particular case bring it within the rule, however well defined the latter may be."

And there can be no constitutional objection to permitting the assessing officers to determine the fact as to when moneyed capital is, and when it is not, brought into competition with national banks doing business in a given community or locality, so long as the bank has the right to resort to the courts in the event that erroneous action is taken by the assessing officers.

The contention made that different assessing officers may arrive at conflicting decisions under identical facts was also made in the last above-cited case, where the court said: "We fully appreciate that in the enforcement of this statute perplexing questions may arise whether given cases come within its terms and that in attempting to solve these questions administrative officials may make determinations which will be conflicting. That is not an unusual experience. Even juries have been known to render contradictory verdicts upon substantially similar evidence. The fact that a statute is difficult of

application and that the administration of a definite rule does not always lead to uniform results has never been regarded as a reason for holding the statute unconstitutional. The statute prescribes the rule of conduct; the administrative officials decide as a matter of fact whether a given case comes within the rule and they may commit errors and differ in their conclusions. It would be difficult to find any statute which has given more trouble in its application than our Workmen's Compensation Act (Consol. Laws, Chap. 67) providing that an accident for which compensation may be allowed to an employee must arise 'in the course of his employment.' The rule is perfectly definite; its application is troublesome. The reports are filled with decisions determining that a given accident was or was not within the terms of the statute, but no one has seriously contended that this feature rendered the statute unenforceable. Courts have been engaged in determining its application and correcting errors which have been made by the board appointed to carry it out and we have no doubt that the same result will be accomplished in the case of this statute and that the forebodings of those who question its validity will be largely eliminated. It very likely may happen that the typical and ordinary application of its provisions will be found in the cases of those who are employing moneyed capital to carry on a private banking business or business akin thereto. But, however this may be, the courts will be open to correct any unjustified application of its provisions and any unauthorized assessment.''

Moreover, the rule is well settled that only those affected ▆▆▆ by an unconstitutional Act will be heard to assert its invalidity. If this Act delegates judicial powers to assessing officers (a point we do not concede), then only those whose moneyed capital was erroneously classified will be heard to complain.

Finally it is contended that Chapter 64, Laws of 1929, is in ▆▆▆▆▆ conflict with section 23 of Article V of the Constitution, in that it contains more than one subject. The complaint does not challenge the statute on this ground. After the close

of the evidence, plaintiff requested leave to amend the complaint in this respect, and the motion was denied. The court did not abuse its discretion in denying the motion.

The contention on its merits cannot be sustained. The contention is that, since prior laws (secs. 1999, 2000, Rev. Codes 1921) had to do solely with the classification of property and imposed no duties on the county assessor (*Hilger* v. *Moore*, 56 Mont. 146, 182 Pac. 477; *State ex rel. Galles* v. *Board of County Commrs.*, 56 Mont. 387, 185 Pac. 456), Chapter 64, which amends these sections in so far as classification of moneyed capital is concerned and attempts to impose duties on the assessor, embraces two subjects. With this we do not agree. Chapter 64 has to do with the taxation of a certain class of property. The classification and assessment of property relate directly to the one subject of the taxation of the property. Where all of the different parts of a statute have a natural connection and relate directly or indirectly to one legitimate subject of legislation, the Act is not invalid as containing more than one subject. (*Evers* v. *Hudson*, 36 Mont. 135, 92 Pac. 462; *State* v. *Ross*, 38 Mont. 319, 99 Pac. 1056; *State* v. *McKinney*, 29 Mont. 375, 74 Pac. 1095, 1 Ann. Cas. 579; *Barbour* v. *State Board of Education*, 92 Mont. 321, 13 Pac. (2d) 225.)

Other contentions made by plaintiff have been decided adversely to it in the companion case of *Bank of Miles City* v. *Custer County*, supra.

We fail to find any ground for condemning the statutes in question.

The judgment is affirmed.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES MATTHEWS, STEWART and ANDERSON concur.

Rehearing denied March 24, 1933.