FIRST NATIONAL BANK OF HARTFORD, Respondent, vs. CITY OF HARTFORD, Appellant.

*February 14—June 22, 1925.*

*Taxation: Shares of stock in national banks: Validity of statute authorizing tax: Evidence: Judicial notice: In matters of state-wide application: Capital in competition with national banks: Inconsequential amount in Wisconsin: Absence of hostile intent in enacting tax law.*

1. If a city, without power or jurisdiction, levied a tax on the shares of stock of a national bank, a taxpayer who made payment under protest may recover from the city any sum paid on account of the tax so illegally assessed and levied without showing that the tax was in fact inequitable.  p. 296.

2. A state may not tax shares of stock in national banking associations except by the consent of the United States.  p. 297.

3. In a determination by the state court of the question whether a tax on national bank stock under sec. 70.31, Stats. Wis. (as in force during 1921, when the tax was assessed), is violative of sec. 5219, R. S. of U. S., the interpretation placed on the latter enactment by the supreme court of the United States is *held* binding, especially where Congress has approved such interpretation by adopting the language of the court in an amendment of the act passed March 4, 1923.   p. 300.

4. General findings of law and fact as to whether sec. 70.31, Stats. Wis., is discriminatory in favor of other moneyed capital in competition with national banks, so as to violate sec. 5219, R. S. of U. S., are not conclusive as in an ordinary case, the law being of state-wide application and being either valid *in toto* or void *in toto,* and the court being required to take judicial notice of the general conditions to which the law applies.   p. 304.

5. In the enactment of sec. 70.31, Stats., there was no unfriendly discrimination or hostile intent on the part of the state of Wisconsin against national banking associations.   p. 305.

6. The restriction in sec. 5219, R. S. of U. S., against taxing the shares of national banks at a greater rate than other "moneyed capital in the hands of individual citizens," is limited to apply to moneyed capital in "competition" with national banks, which is any material amount of moneyed capital engaged in a business which bids against national banks for business which they are authorized to do, "competition" being opposed to monopoly, and involving the idea of struggle to obtain the same thing.   p. 317.

7. Capital invested in building and loan associations is not "moneyed capital in the hands of individual citizens" in competition with national banks, within the meaning of sec. 5219, R. S. of U. S., prohibiting discrimination in the tax on national bank stock as compared with that on other moneyed capital.   p. 319.

8. Brokers and dealers in bonds, mortgages, and securities, not being bankers as indicated by sec. 221.49, Stats. Wis., are not in competition with national banks within the meaning of sec. 5219, R. S. of U. S., national banks not being authorized to traffic in mortgages, bonds, or securities except as incident to their principal business.   p. 319.

9. Merchandisers of securities are not bankers, and all persons doing a banking business in Wisconsin are required to organize as banks.   p. 320.

10. Acceptance companies purchasing conditional-sales contracts are not in competition with national banks within the meaning of sec. 5219, R. S. of U. S., there being a wide gap between the securities handled by such companies and the ordinary commercial paper accepted by banks.   p. 320.

11. Express companies being public utilities and assessable on an *ad valorem* basis, their competition with national banks, as dealers in foreign exchange, will not be considered in determining whether sec. 70.31, Stats. Wis., is discriminatory within the meaning of sec. 5219, R. S. of U. S., in the absence of a showing that the capital invested in these companies is assessed at a lower rate.    p. 321.

12. Capital of individuals invested in bonds, mortgages, and securities is not in competition with capital invested in shares of national banks in any consequential amount, within the business field of banks, which is restricted as by the Federal Reserve Act, sec. 24, within the meaning of said sec. 5219, R. S. of U. S., and therefore sec. 70.31, Stats. Wis., taxing shares of national bank stock, is not discriminatory in comparison with such capital.    p. 321.

VINJE, C. J., and ESCHWEILER and JONES, JJ., dissent.

APPEAL from a judgment of the circuit court for Washington county: C. M. DAVISON, Circuit Judge. *Reversed.*

Taxation of shares in national banking associations. This action was begun to recover certain moneys paid by the plaintiff under protest to the city of *Hartford* as taxes levied upon the shares of stock of the plaintiff national bank. Shares of stock in national banking associations are assessed pursuant to sec. 70.31, Wis. Stats. 1923, printed in the margin.[1]

---

[1] 70.31  *Bank stock, assessment.* (1) The president, cashier or other officer in charge of any bank, shall make out and deliver to the assessor annually on or before the first day of June a verified statement showing the number and par value of the shares of stock, the names and residence of each stockholder therein on the preceding first day of May and the amount of stock owned or held by him on that day.

(2) All the shares of stock of every bank or banking association whether organized under the authority of any law of this state or of any act of the Congress of the United States shall be assessed and taxed in the assessment district in which such bank is located for the transaction of business.

(3) The shares of stock in any bank shall be liable to assessment and taxation as personal property and shall be entered upon the assessment roll in the names of the several owners, separately from the assessment of other personal property assessable to such owners.   The valuation of such shares of stock and the taxes thereon shall be separately entered in the tax roll.

By the provisions of sec. 70.39, Wis. Stats. 1923, any bank is authorized to pay taxes assessed on its shares of stock for its stockholders at its option. The plaintiff bank exercised its option to pay the amount assessed against the owners of its capital stock under protest and brought this action to recover back the amount so paid.

The case was tried before the court, and at the conclusion of the trial the judge made and filed the following findings of fact:

"1. That the plaintiff is, and at the times herein stated was, a national banking corporation engaged in the banking business at Hartford, Wisconsin, with a paid-up capital stock of fifty thousand dollars ($50,000) consisting of five hundred (500) shares of the par value of one hundred dollars ($100), and all owned by various stockholders of said bank.

"2. That the defendant is a city of the fourth class, operating under the general charter law of this state.

"3. That during the year 1921 the taxing officers of the defendant city of *Hartford* in form assessed and levied a personal property tax for such year on all of the said shares of stock of the plaintiff bank at the then prevailing tax rate in the assessment district in which said bank is located, to wit, at the rate of three and one hundred seventy-seven thousandths dollars ($3.177), on each one hundred dollars ($100) of the assessed valuation of such stock, which tax on the whole of said stock amounted to two thousand eight hundred fifty-nine and 30-100 dollars ($2,859.30). That such taxes were entered upon the tax roll of the defendant city for said year, and in due time the tax roll for said year, with the taxes so in form against said shares of stock spread thereon, and the warrant for the collection thereof, were placed in the hands of the city treasurer of said city for the collection of said taxes.

"4. That said taxing officers of said defendant city did not make any assessment against, or levy any tax for said year 1921 upon, any moneys or moneyed capital in the hands of any individual citizens of said city, or against any debts due or to become due to such individual citizens, or against any interest-bearing bonds, or against any shares of stock in the hands of any of such citizens, in any corporation except

banking corporations, but suffered and permitted the same and the whole thereof to be and remain entirely free from assessment, and exempt from taxation for said year, in accordance with the provisions of subsection 10 of section 70.11 of the Wisconsin Statutes.

"5. That during the year 1921 there was a very large amount of moneyed capital in the hands of individual citizens of said city of *Hartford,* running into many hundreds of thousands of dollars, that was neither assessed for taxation nor taxed, which entered into competition with the banking business, including the banking business of the plaintiff.

"That during said year 1921 there were vast amounts of moneyed capital in the hands of individual citizens of this state, running into millions of dollars, that entered into competition with the banking business, that under the provisions of said section 70.11, subsection 10, were wholly exempted from taxation.

"That, as a result thereof, the shares of stock of said plaintiff bank, as well as the shares of stock of other national banking corporations doing business in this state, were taxed or attempted to be taxed at a much greater rate than other moneyed capital in the hands of individual citizens of said city and state that entered into competition with the banking business, including the banking business of the plaintiff; and the taxation of said shares of stock in said banks, including the plaintiff bank, and the exemption of said amounts of moneyed capital in the hands of individual citizens entering into competition with the banking business, resulted in an unjust, illegal, and discriminating tax against said bank's shares.

"6. That on February 28, 1922, and while said tax roll and warrant with said taxes in form against the shares of said plaintiff bank so spread thereon were in the hands of the treasurer of said city for collection of taxes, the said plaintiff in behalf of its stockholders, as well as in its own behalf and interest, paid said tax under protest to the city treasurer of said city, in the sum of two thousand eight hundred fifty-nine and 30-100 dollars ($2,859.30). That at the time plaintiff so paid said tax it accompanied the payment with and said city accepted the same, under a written protest then lodged with said city stating, among other

things, that said taxes were unjust, discriminatory, and illegally exacted in violation of the federal and state constitutions under menace of compulsion and unjust and oppressive penalties, and further stating that the city treasurer, to whom the check for such taxes was given, was authorized to cash the same, only, as an alternative to the resort to distress or other means provided by law for the enforcement of unpaid taxes; that said bank claimed the right and would seek all available means for the recovery of such taxes.

"7. That on January 27, 1923, the plaintiff, in behalf of itself and its said stockholders, filed with the city clerk of said city its verified claim in writing against said city for the refund and repayment of the amount of said taxes and interest, a copy of which claim is annexed to the complaint herein.

"That on the 16th day of February, 1923, the common council of said defendant city, upon consideration of said claim, affirmatively disallowed the same."

And, upon the facts so found, concluded that the tax so levied and assessed against the shares of stock of the plaintiff bank was unauthorized, illegal, and void in its inception, in violation of and repugnant to the provisions of sec. 5219 of the Revised Statutes of the United States; that the tax had not been voluntarily paid, and that the plaintiff was entitled to recover judgment against the defendant city as demanded in the complaint. The findings were excepted to and proper findings were requested to sustain the contention of the defendant, which requests were denied by the court, and to the denial of such requests there were proper exceptions. Judgment was thereafter entered in accordance with the findings of fact and conclusions of law in favor of the plaintiff and against the defendant for the sum of $3,190.84 damages, together with the costs and disbursements taxed at $113.50, from which judgment the defendant appeals.

*J. C. Russell,* city attorney, and *Edward M. Smart* of Milwaukee, of counsel, for the appellant.

For the respondent there was a brief by *E. W. Sawyer* of Hartford, attorney, and *Sawyer & Gehl* of Hartford and

*Miller, Mack & Fairchild* of Milwaukee, of counsel, and a separate brief by *Miller, Mack & Fairchild;* and the cause was argued orally by *E. W. Sawyer* and by *J. G. Hardgrove* and *Leon F. Foley* of Milwaukee.

On behalf of the State there was a brief by the *Attorney General* and *Franklin E. Bump,* assistant attorney general, and oral argument by *Mr. Bump.*

On behalf of the cities of Oshkosh, Merrill, Clintonville, Neenah, and Sturgeon Bay there was a brief by *Frank C. Stewart* of Oshkosh, *Ralph E. Smith* of Merrill, *George H. Kelly* of Neenah, *R. H. Morris* of Clintonville, and *H. M. Ferguson* of Sturgeon Bay, attorneys, and *Edward J. Dempsey* of Green Bay and *Edward M. Smart* of Milwaukee, of counsel, as *amici curiæ,* and oral argument by *Mr. Stewart* and *Mr. Smart.*

A brief was also filed by *Weed & Hollister* of Oshkosh, as *amici curiæ,* on behalf of the Old-Commercial National Bank of Oshkosh, the First National Bank of Neenah, and others.

The following opinion was filed April 7, 1925:

ROSENBERRY, J.    Counsel for the defendant claim that there can be no recovery because there is no showing that the tax levied was in fact inequitable.   The contentions of counsel upon this branch of the case fail because, if the principal contention made by the plaintiff is sustained, the city of *Hartford* had no power or jurisdiction to levy an assessment upon the shares of stock of the plaintiff bank, and under the provisions of sec. 74.73, Stats., the plaintiff having made payment under protest, it is entitled to maintain an action to recover back any sum paid by it on account of taxes so illegally assessed and levied.   It is not claimed that the taxing authorities acted irregularly or in violation of the provisions of the laws of the state of Wisconsin, but that there was no authority whatever in the taxing authorities of the city of *Hartford* to assess and levy the tax in question.

First Nat. Bank v. Hartford, 187 Wis. 290.

This brings us to a consideration of the principal question raised upon this appeal. This question may be stated in the language of the statute as follows: Are the shares of stock in national banking associations within the state of Wisconsin assessed at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such state? The solution of this question depends upon the interpretation of sec. 5219, Revised Statutes of the United States (Act of June 3, 1864, ch. 106; Act of Feb. 10, 1868, ch. 7). In determining the proper construction and interpretation of that section some fundamental matters may properly be adverted to. In the firšt place, the state of Wisconsin may not tax shares of stock in national banking associations, such associations being instrumentalities of the federal government, except by the consent of the United States. *Adams v. Nashville* (1877), 95 U. S. 19; *Mercantile Bank v. New York* (1887), 121 U. S. 138, 7 Sup. Ct. 826; *M'Culloch v. Maryland* (1819), 4 Wheat. 316.

State taxation of national bank shares was first permitted by act of Congress of June 3, 1864 (13 U. S. Stats. at Large, 99, 112, National Banking Act), subject to the restriction that it should not be "at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such state: Provided, further, that the tax so imposed under the laws of any state upon the shares of any of the associations authorized by this act shall not exceed the rate imposed upon the shares in any of the banks organized under authority of the state where such association is located. . . ."

The act of 1864 was modified and amended by the act of February 10, 1868 (15 U. S. Stats. at Large, 34) and subsequently became sec. 5219, Revised Statutes of the United States, and was as follows:

"Sec. 5219. Nothing herein shall prevent all the shares in any association from being included in the valuation of the

personal property of the owner or holder of such shares, in assessing taxes imposed by authority of the state within which the association is located; but the legislature of each state may determine and direct the manner and place of taxing all the shares of national banking associations located within the state, subject only to the two restrictions, that the taxation shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such state, and that the shares of any national banking association owned by nonresidents of any state shall be taxed in the city or town where the bank is located, and not elsewhere. Nothing herein shall be construed to exempt the real property of associations from either state, county, or municipal taxes, to the same extent, according to its value, as other real property is taxed."

This section was amended by act of March 4, 1923, ch. 267 (42 U. S. Stats. at Large, 1499). The facts in this case, however, arose prior to the amendment of March 4, 1923, and it is therefore not material here except that it is therein provided "that bonds, notes, or other evidences of indebtedness in the hands of individual citizens not employed or engaged in the banking or investment business and representing merely personal investments not made in competition with such business, shall not be deemed moneyed capital within the meaning of this section."

The act of 1864 came before the courts almost immediately for construction. See *Van Allen v. Assessors* (1865), 3 Wall. 573. It also appears from the Congressional Globe, Part I, 2d session 40th Congress, 1867–1868, p. 801, that there was difficulty in applying the authority conferred by the act of 1864 in respect to the place where the shares in national banking associations should be taxed. It was this difficulty that led to the revision in this particular of the act of 1864 by the act of 1868. In this connection, however, it is interesting to note that in *Lionberger v. Rouse* (1869), 9 Wall. 468, the facts in which arose prior to the amendment, it was held that the second limitation in the

proviso to the forty-first section of the national banking act, which provides that the tax which the section allows the states to impose on the shares held by persons in the said banks "shall not exceed the rate imposed upon the shares in any of the banks organized under the authority of the state where such association is located," referred only to banks of issue created under the laws of the taxing state. For some reason, which is not disclosed, the language last above quoted was dropped from the law by the amendment of 1868. There appears to have been no discussion of the amendment in that respect.

The purpose of Congress in enacting the statute cannot be more clearly stated than in the language of the supreme court of the United States in *People v. Weaver* (1879), 100 U. S. 539:

"In permitting the states to tax these shares, it was foreseen—the cases we have cited from our former decisions showed too clearly—that the state authorities might be disposed to tax the capital invested in these banks oppressively.

"This might have been prevented by fixing a precise limit in amount. But Congress, with due regard to the dignity of the states, and with a desire to interfere only so far as was necessary to protect the banks from anything beyond their equal share of the public burdens, said, you may tax the real estate of the banks as other real estate is taxed, and *you may tax the shares of the bank as the personal property of the owner to the same extent you tax other moneyed capital invested in your state.* It was conceived that by this qualification of the power of taxation equality would be secured and injustice prevented.

"That such was the intent of Congress can admit of no doubt. Have they given expression to that intent so that courts can see and enforce it, or have they expressed themselves so unfortunately that the states may, by a narrow interpretation of the act of Congress and by skilfully framed statutes of their own, exercise the power thus granted so as not only to reap its full benefit, but at the same time cause the burden of supporting the state government to fall with

unequal weight on the subject of taxation thus surrendered to it by the national government?"

It is also plain that it was not the intention of Congress, by the enactment of sec. 5219 as amended, to prohibit reasonable exemptions or to interfere with the discretion of the legislatures of the various states in granting exemptions as it existed prior to the enactment of the statutes. *Adams v. Nashville* (1877), 95 U. S. 19; *Boyer v. Boyer* (1885), 113 U. S. 689, 5 Sup. Ct. 706; *Mercantile Bank v. New York* (1887), 121 U. S. 138, 7 Sup. Ct. 826.

If sec. 5219 as amended were presented without interpretation by the supreme court of the United States, we should have no difficulty in affirming the judgment of the trial court, for the reason that there are many businesses in which "moneyed capital in the hands of individual citizens" is exempt from *ad valorem* taxation and the income derived therefrom is taxed, which income tax is in lieu of other taxes. The statute has, however, been interpreted many times, and we are as much bound by the interpretation placed upon it by the supreme court of the United States as though such interpretation was included within the language of the statute, especially in view of the fact that Congress adopted the language of the court in the amendment of March 4, 1923. This was an express legislative approval of the interpretation of the court. *Camp v. Gress* (1918), 250 U. S. 308, 315, 39 Sup. Ct. 478; *Heald v. District of Columbia* (1920), 254 U. S. 20, 41 Sup. Ct. 42.

With the provisions of the federal law in mind, we pass to a consideration of the taxing laws of the state of Wisconsin. From the foundation of the state government down to the enactment of ch. 658 of the Laws of 1911, it had been the policy of the state to levy its general taxes upon property, with the exception of inheritance taxes and license taxes first levied upon railroads and later upon other public-service corporations. An amendment to the constitution authorizing the legislature to impose taxes on incomes, privileges, and

First Nat. Bank v. Hartford, 187 Wis. 290.

occupations was approved at the November, 1908, election. The enactment of ch. 658 of the Laws of 1911 worked an important and fundamental change in the general taxation policy of the state. See *Income Tax Cases,* 148 Wis. 456, at 503 *et seq.* (134 N. W. 673, 135 N. W. 164), for a full history of the matter. In that case it was said (p. 505):

"By the present law it is quite clear that personal property taxation for all practical purposes becomes a thing of the past. The specific exemptions of all money and credits and the great bulk of stocks and bonds, as well as of all farm machinery, tools, wearing apparel, and household furniture in actual use, regardless of value, goes far to eliminate taxation of personal property; while the provision that he who pays personal property taxes may have the amount so paid credited on his income tax for the year seems to put an end to any effective taxation of personal property. That taxation of such property has proven a practical failure will be admitted by all who have given any attention to the subject. Doubtless this was one of the main arguments in the legislative mind for the passage of the present act. By this act the legislature has, in substance, declared that the state's system of taxation shall be changed from a system of uniform taxation of property (which so far as personal property is concerned has proven a failure) to a system which shall be a combination of two ideas, namely, taxation of persons progressively according to ability to pay, and taxation of real property uniformly, according to value."

When the legislature, in the course of revising the tax laws of the state, came to the matter of taxation of shares of stock in national banking associations, it was confronted by the fact that sec. 5219 authorized an *ad valorem* tax against stockholders on the shares of stock and on the real property owned by the association and nothing else. *Owensboro Nat. Bank v. Owensboro* (1899), 173 U. S. 664, 19 Sup. Ct. 537; *First Nat. Bank v. Albright* (1908), 208 U. S. 548, 28 Sup. Ct. 349. The legislature was therefore compelled to permit capital invested in national bank shares to escape taxation entirely (except upon real estate) or to tax upon an

*ad valorem* basis all moneyed capital in the hands of individual citizens of the state which came into competition with the business of national banks within the rule laid down in *Mercantile Bank v. New York* (1887), 121 U. S. 138, 7 Sup. Ct. 826. Its only other alternative was to continue on the old *ad valorem* basis as to taxation of moneys, credits, and personal property which had proven a failure.

Desirous of exercising the power conferred upon it to levy an income tax, the legislature undertook to so classify moneyed capital as to bring all moneyed capital in competition with moneyed capital invested in the shares of national banks into one class, taxing all such moneyed capital upon an *ad valorem* basis and levying a tax upon the income derived from other moneyed capital not so in competition. It was therefore provided by sec. 70.31, heretofore set out in the margin, that shares of all banking companies should be taxed on an *ad valorem* basis. This classification rested upon the fact that prior to 1911, pursuant to an amendment to the constitution of the state, the laws regulating banks and banking had been thoroughly revised. See ch. 94, Stats. 1911; chs. 220, 221, 222, 223, and 224, Stats. 1923.

Banking was defined as follows (sec. 224.02, Stats. 1923):

"The soliciting, receiving, or accepting of money or its equivalent on deposit as a regular business by any person, copartnership, association, or corporation, shall be deemed to be doing a banking business, whether such deposit is made subject to check or is evidenced by a certificate of deposit, a pass-book, a note, a receipt, or other writing, provided that nothing herein shall apply to or include money left with an agent, pending investment in real estate or securities for or on account of his principal" (Stats. 1921, sec. 2024—78*l*).

By the provisions of sec. 2024—78*m*, Stats. 1911 (sec. 224.03, Stats. 1923), it was made unlawful for any person, copartnership, association, or corporation to do a banking business without having been regularly organized and chartered as a national bank, a state bank, a mutual savings bank,

or a trust company bank, and a violation of this prohibition was made a misdemeanor. Provisions were created by which any person, firm, or corporation theretofore doing a banking business might reorganize as a state bank. Since the enactment of that law the banking business of the state has been strictly confined to national banks and corporations organized under the banking laws of the state. The banks, state and national, have a complete monopoly of the banking business and see to it that their privileges in that particular are not infringed upon.

This statute was construed in *MacLaren v. State,* 141 Wis. 577, 124 N. W. 667, where it was held that a person or corporation engaged in the business carried on by banks of deposit or of discount or of circulation is doing a banking business although but one of these functions be exercised. In that case, Gimbel Brothers, operating a large department store, created a deposit purchase department, accepted money on deposit, issued pass-books therefor, and charged the purchases of the depositors against the account, interest being paid upon the deposit, and the depositor having an option to withdraw the money on demand with interest. This was held to be in violation of the statute.

That the law has been strictly enforced is indicated by reference to the annual report of the commissioner of banking for the year 1918, at page 409, where it is shown that industries attempted to organize a department for the encouragement of thrift and accepted deposits from their employees. This was held to be within the prohibition of the banking act. State banking institutions were organized and the controversy never reached this court. In the state of Wisconsin there is no person, firm, or corporation receiving deposits, issuing bills or with power to issue bills, or engaged in the business of discount as carried on by banks, except those organized under the banking law of the state *or of the United States.* Building and loan associations receive deposits of a limited kind and under certain restrictions that

do not apply to banks, state or national. See chs. 215, 216, Stats. 1923.

Since 1911 the state of Wisconsin has had the following general system of taxation: (1st) the general property tax, which includes real and personal property other than moneys, credits, and intangibles; (2d) corporation taxes on public utility companies; (3d) license taxes on the gross earnings of telephone and insurance companies; (4th) income taxes; (5th) inheritance taxes; (6th) occupation taxes on the operation of coal docks and elevators. The income tax act of 1911 exempted the income of state banks, national banks, mutual savings banks, trust companies, mutual loan corporations, building and loan associations and co-operative corporations or associations organized under ch. 185, from payment of an income tax. All other persons, firms, and corporations are required to pay such a tax. The shares in all banking associations of the various kinds hereinbefore described were taxable as personal property, under sec. 70.31, hereinbefore set out in the margin. The classification established by ch. 658, Laws of 1911, stood without challenge for ten years. Is the tax levied pursuant to this law, which has not been substantially changed, discriminatory under the provisions of sec. 5219, Revised Statutes of the United States?

At this point we may say that in our consideration of the validity of this legislation we do not consider ourselves concluded as in an ordinary case by the findings of fact made by the trial court, not only because the findings are general in their terms and present matters which are mixed questions of law and fact, but for the further reason that the law under consideration is one of state-wide application. The court is required to take judicial notice of the general conditions to which the law applies. It is either valid *in toto* or void *in toto*. Its validity cannot be made dependent upon a particular finding of fact relating to the conditions in a single locality so that, assuming it to be administered as written,

the law might be held valid in one place, void in another, or valid at one time and void at another. *State v. Layton,* 160 Mo. 474, 61 S. W. 171; *Pittsburgh, C., C. & St. L. R. Co. v. Hartford City,* 170 Ind. 674, 82 N. E. 787, 85 N. E. 362; *St. Louis v. Liessing,* 190 Mo. 464, 89 S. W. 611, 1 L. R. A. N. S. 918, 20 L. R. A. N. S. 461. In this respect this case differs materially from some of the cases heretofore decided by the supreme court of the United States.

Nor does our conclusion in any manner rest upon the argument that the income tax is an equivalent or substitute for the *ad valorem* tax levied upon the stock of national banking associations, and in that respect we agree with the conclusion of the New York court of appeals in *People ex rel. Hanover Nat. Bank v. Goldfogle,* 234 N. Y. 345, 137 N. E. 611, and for the reasons there stated. It is to be noted in this connection, however, that there are not in Wisconsin, as there are in the state of New York, private banking institutions.

We have no difficulty in concluding that there was no "hostile intent," "unfriendly attitude," or "unfriendly discrimination" in the enactment of the laws under and by virtue of which the tax in question was assessed and levied on the part of the state of Wisconsin toward national banking associations. *First Nat. Bank v. Chapman* (1898), 173 U. S. 205, 213, 19 Sup. Ct. 407.

No doubt if the law is clearly discriminatory, hostile intent would follow as a necessary legal inference, but there is no evidence—in fact there is no claim made in this case—that it exists in fact.

As hereinbefore stated, in the absence of prior authoritative construction of the statute there would seem to be no difficulty in concluding that shares in national banking associations are assessed at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of the state of Wisconsin where such moneyed capital is entirely exempt from *ad valorem* taxation and pays only a tax

upon its income, but the meaning of the phrase *"other moneyed capital in the hands of individual citizens"* has been limited.

In *Mercantile Bank v. New York,* 121 U. S. 138, 7 Sup. Ct. 826, the decisions of the court down to that time were cited and fully reviewed. We may well begin our consideration of the ultimate question in the case at bar in the light of the conclusions reached in that case. After reciting the purpose of the act of Congress and the policy involved, it was said (we have here, as elsewhere, italicised the more material parts):

"It was deemed consistent, however, with these national uses, and otherwise expedient, to grant to the states the authority to tax them [national banking associations] within the limits of a rule prescribed by the law. In fixing those limits it became necessary to prohibit the states from imposing such a burden as would prevent the capital of individuals from freely seeking investment in institutions which it was the express object of the law to establish and promote. The business of banking, including all the operations which distinguish it, might be carried on under state laws, either by corporations or private persons, and capital in the form of money might be invested and employed by individual citizens in many single and separate operations forming substantial parts of the business of banking. . . . *The main purpose, therefore, of Congress, in fixing limits to state taxation on investments in the shares of national banks, was to render it impossible for the state, in levying such a tax, to create and foster an unequal and unfriendly competition, by favoring institutions or individuals carrying on a similar business and operations and investments of a like character. The language of the act of Congress is to be read in the light of this policy.*

"Applying this rule of construction, we are led, in the first place, to consider the meaning of the words 'other moneyed capital,' as used in the statute. Of course it includes shares in national banks; the use of the word 'other' requires that. If bank shares were not moneyed capital, the word 'other' in this connection would be without significance. But 'moneyed capital' does not mean all capital the value of

which is measured in terms of money. In this sense, all kinds of real and personal property would be embraced by it, for they all have an estimated value as the subjects of sale. Neither does it necessarily include all forms of investment in which the interest of the owner is expressed in money. *Shares of stock in railroad companies, mining companies, manufacturing companies, and other corporations, are represented by certificates showing that the owner is entitled to an interest, expressed in money value, in the entire capital and property of the corporation, but the property of the corporation which constitutes its invested capital may consist mainly of real and personal property, which, in the hands of individuals, no one would think of calling moneyed capital, and its business may not consist in any kind of dealing in money, or commercial representatives of money.*

"So far as the policy of the government in reference to national banks is concerned, it is indifferent how the states may choose to tax such corporations as those just mentioned, or the interest of individuals in them, or whether they should be taxed at all. *Whether property interests in railroads, in manufacturing enterprises, in mining investments, and others of that description, are taxed or exempt from taxation, in the contemplation of the law, would have no effect upon the success of national banks.* There is no reason, therefore, to suppose that Congress intended, in respect to these matters, to interfere with the power and policy of the states. The business of banking, as defined by law and custom, consists in the issue of notes payable on demand, intended to circulate as money where the banks are banks of issue; in receiving deposits payable on demand; in discounting commercial paper; making loans of money on collateral security; buying and selling bills of exchange; negotiating loans, and dealing in negotiable securities issued by the government, state and national, and municipal and other corporations. *These are the operations in which the capital invested in national banks is employed, and it is the nature of that employment which constitutes it in the eye of this statute 'moneyed capital.' Corporations and individuals carrying on these operations do come into competition with the business of national banks, and capital in the hands of individuals thus employed is what is intended to be described by the act of Congress.* That the words of the law must be so limited

appears from another consideration: they do not embrace any moneyed capital in the sense just defined, except that in the hands of individual citizens. *This excludes moneyed capital in the hands of corporations, although the business of some corporations may be such as to make the shares therein belonging to individuals moneyed capital in their hands, as in the case of banks.* A railroad company, a mining company, an insurance company, or any other corporation of that description, may have a large part of its capital invested in securities payable in money, and so may be the owners of moneyed capital; but, as we have already seen, the shares of stock in such companies held by individuals are not moneyed capital.

"*The terms of the act of Congress, therefore, include shares of stock or other interests owned by individuals in all enterprises in which the capital employed in carrying on its business is money, where the object of the business is the making of profit by its use as money.* The moneyed capital thus employed is invested for that purpose in securities by way of loan, discount, or otherwise, which are from time to time, according to the rules of the business, reduced again to money and reinvested. *It includes money in the hands of individuals employed in a similar way, invested in loans, or in securities for the payment of money, either as an investment of a permanent character, or temporarily with a view to sale or repayment and reinvestment.* In this way the moneyed capital in the hands of individuals is distinguished from what is known generally as personal property."

In the *Mercantile Bank v. New York Case* it was held that trust companies which had power "to receive moneys in trust and to accumulate the same at an agreed rate of interest; to accept and execute all trusts of every description committed to them by any person or corporation or by any court of record; to receive the title to real or personal estate on trusts created in accordance with the laws of the state and to execute such trusts; to act as agent for corporations in reference to issuing, registering, and transferring certificates of stock and bonds, and other evidences of debt; to accept and execute trusts for married women in respect to their

separate property; and to act as guardian for the estates of infants," were not banks in the commercial sense of that word, and do not perform the functions of banks in carrying on the exchanges of commerce; that while it is true they receive money on deposit, invest it in loans, and so deal in money and securities for money in such a way as properly to bring the shares of stock held by individuals therein within the definition of "moneyed capital in the hands of individuals," as used in the act of Congress, that nevertheless there was no discrimination where trust companies were taxed as other corporations upon the actual value of their capital stock.

In the same case it was held that although savings bank deposits to the amount of over $400,000,000 were exempt from taxation and that these deposits constitute moneyed capital in the hands of individuals within the meaning of the statute, yet the court held that it was "clear that they are not within the meaning of the act of Congress in such sense as to require that, if they are exempted from taxation, shares of stock in national banks must thereby also be exempted from taxation," for, said the court: "No one can suppose for a moment that savings banks come into any possible competition with national banks of the United States. . . . However large, therefore, may be the amount of moneyed capital in the hands of individuals, in the shape of deposits in savings banks as now organized, which the policy of the state exempts from taxation for its own purposes, that exemption cannot affect the rule for the taxation of shares in national banks, provided they are taxed at a rate not greater than other moneyed capital in the hands of individual citizens otherwise subject to taxation."

In *Davenport Bank v. Davenport* (1887), 123 U. S. 83, 8 Sup. Ct. 73, it appeared that a statute of the state of Iowa taxed savings banks on the amount of their paid-up capital but did not tax the shares of savings banks held by individual shareholders, and it was claimed that the capital of

savings banks could only be taxed by the state by an assessment upon the shares of that capital held by individuals because under the act of Congress the capital of national banks could only be taxed in that way. The court said:

"It has never been held by this court that the states should abandon systems of taxation of their own banks, or of money in the hands of their other corporations, which they may think the most wise and efficient modes of taxing their own corporate organizations, in order to make that taxation conform to the system of taxing the national banks upon the shares of their stock in the hands of their owners. *All that has ever been held to be necessary is, that the system of state taxation of its own citizens, of its own banks, and of its own corporations shall not work a discrimination unfavorable to the holders of the shares of the national banks.*"

In the *Davenport Case* the court held that a tax imposed upon a savings bank was in fact equal to that imposed upon the shares of national banks. The doctrine of the *Davenport Case* was affirmed in *Bank of Redemption v. Boston* (1888), 125 U. S. 60, 8 Sup. Ct. 772. In this case it was claimed that the tax levied upon national banks compared with the tax levied upon savings banks, pursuant to the laws of the state of Massachusetts, was discriminatory. The court said:

"It is alleged that in Massachusetts savings banks are permitted to transact a banking business in the way of loans upon personal securities, which assimilates them more closely to national banks, and takes away the reason for the application of the rule to them which was applied to the case of the savings banks of New York. But the difference mentioned, if it exists at all, is immaterial; the main purpose and chief object of savings banks, as organized under the laws of Massachusetts, are the same as those in New York, as considered in the case of the *Mercantile Bank*. They are substantially institutions, under public management, in pursuance of a great and beneficial public policy, organized for the purpose of investing the savings of small depositors, and not as banking institutions in the commercial sense of that

phrase. We adhere to the rule as declared in the cases heretofore decided, which forecloses further discussion as to the present point in this case."

It was also urged that the tax was discriminatory when compared with the taxation upon insurance companies, trust companies, American Bell Telephone Company, and the Massachusetts Hospital Life Insurance Company. This objection was held untenable, and it was said that the interest of individuals in these institutions is not moneyed capital within the meaning of that term as established in the *Mercantile Bank Case,* and that the investments made by the institutions themselves constituting their assets are not moneyed capital in the hands of individual citizens of the state, citing *People v. Commissioners,* 4 Wall. 244.

In *Talbott v. Silver Bow Co.* (1891), 139 U. S. 438, 448, 11 Sup. Ct. 594, in commenting upon sec. 5219 the court said:

"Obviously by this section, as interpreted by the decisions of this court, the limitation applies solely to a parallel with the individual or corporation whose capital in money is used with a view of compensation for the use of the money. And that is the only restriction which, under the agreed statement of facts, demands any consideration. The tax upon a corporation whose capital is invested in manufacturing or transportation cannot, under this section, be placed in comparison with the tax upon an institution whose business is profit on money as money."

In *Aberdeen Bank v. Chehalis Co.* (1897) 166 U. S. 440, 17 Sup. Ct. 629, it was claimed that money invested in corporations or in individual enterprises that carry on the business of railroads, of manufacturing enterprises, mining investments, and investments in mortgages, came into competition with the business of national banks as other moneyed capital in the hands of individual citizens of the state of Washington. This contention was overruled, the cases were reviewed, and substantially that part of the opinion in

the *Mercantile Bank Case* which has been hereinbefore set out was quoted, and the court said:

"The conclusions to be deduced from these decisions are that money invested in corporations or in individual enterprises that carry on the business of railroads, of manufacturing enterprises, mining investments, and investments in mortgages, does not come into competition with the business of national banks, and is not therefore within the meaning of the act of Congress; that such stocks as those in insurance companies may be legitimately taxed on income instead of on value, because such companies are not competitors for business with national banks; and that exemptions, however large, of deposits in savings banks, or of moneys belonging to charitable institutions, *if exempted for reasons of public policy and not as an unfriendly discrimination against investments in national bank shares, should not be regarded as forbidden by sec. 5219 of the Revised Statutes of the United States.*"

It appears that there was taxable moneyed capital in Chehalis county which escaped taxation, amounting to $237,400; that there was unassessed moneyed capital in other portions of the state exceeding $14,000,000; that the moneyed capital invested in banks, national and state, was $11,000,000; and that there was invested in the stocks and bonds of insurance, wharf and gas companies, and other moneyed institutions, moneyed capital amounting to at least $26,000,000. The court said:

"As to the sum of $237,400, alleged to be invested by individual citizens of Chehalis county in loans and securities to them payable and owing by other citizens of that county, we are not informed by the bill of the nature of such loans and securities, and, as against the pleader, *we may well assume that they belong to a class of investments which does not compete with the business of national banks.* The same is true of the sum of $14,000,000 alleged to be invested in loans and securities by citizens of the state of Washington and to them payable and owing by other citizens of said state."

This case turns upon the proposition that it did not appear from the allegations of the bill that the moneyed capital was in competition with shares in national banking associations. However, the nature of the loans was disclosed, that is, they were made by citizens of the state to other citizens of the state, from which the conclusion follows that loans made by the citizens of a state to other citizens do not, unless they possess some other quality, compete with the business of national banks.

In *First Nat. Bank v. Chapman* (1898), 173 U. S. 205, 19 Sup. Ct. 407, it was held that the system of taxation adopted in Ohio was not intended to be unfriendly to or discriminate against owners of shares in national banks, and it was again held that the term "moneyed capital" did not include capital which does not come into competition with the business of national banks. Both the *Mercantile Bank Case* and the *Aberdeen Bank Case* were cited with approval.

In *Amoskeag Savings Bank v. Purdy* (1913), 231 U. S. 373, 34 Sup. Ct. 114, the whole matter of the validity of the New York plan of taxing national bank shares was again under consideration by the supreme court of the United States. Again the opinion in the *Mercantile Bank Case* was quoted at length, prior cases referred to, and the court said:

"According to this practical test, it seems to us that the scheme adopted by the state of New York for taxing shares in national banks cannot upon this record be denounced as violative of the limitations prescribed by sec. 5219, Rev. Stats. The holders of shares in state banks are subjected to precisely the same taxation, and with respect to other competitive institutions, such as trust companies, the franchise taxes imposed upon them apparently result in a substantially similar burden upon the shareholder. Nor is there any discrimination in favor of savings banks. With respect to individual bankers there is a difference, they being apparently subject to the local rate of taxation and entitled to the privilege of deduction for personal debts; but as they are taxable upon the amount of the capital invested in the

First Nat. Bank v. Hartford, 187 Wis. 290.

banking business, which is normally only such as remains after the deduction of debts, it is not plain that they possess any valuable privilege of reducing the tax assessment by deducting debts. . . . If there be other forms of 'moneyed capital in the hands of individual citizens' of the state employed in a banking or *quasi*-banking business in competition with the national banks, and which are subjected to a more favorable rule of taxation, our attention is not called to them. *Moreover, we agree with what was said by the court of appeals of New York in the Feitner Case, 191 N. Y. 88, 96, 83 N. E. 592, that 'The state is not obliged to apply the same system to the taxation of national banks that it uses in the taxation of other property, provided no injustice, inequality, or unfriendly discrimination is inflicted upon them.' "*

In *Merchants' Nat. Bank v. Richmond* (1921), 256 U. S. 635, 41 Sup. Ct. 619, sec. 5219, Revised Statutes, was again before the supreme court of the United States for consideration. In that case it appears that the tax was imposed pursuant to an ordinance of the city of Richmond, approved April 9, 1915, and it was claimed that that ordinance was repugnant to the provisions of sec. 5219, Revised Statutes. This ordinance taken in connection with the general law of the state authorized the imposition for the year 1915 upon bank stocks, state and national, of a tax for state purposes at the rate of thirty-five cents, a tax for city purposes at the rate of $1.40, a total of $1.75 upon the $100 of valuation, while upon intangible personal property in general, including bonds, notes, and other evidences of indebtedness, the state rate was sixty-five cents, the city rate thirty cents, an aggregate of ninety-five cents upon each $100 of valuation. It further appeared without dispute that moneyed capital in the hands of individuals invested in bonds, notes, and other evidences of indebtedness came into competition with national banks in the loan market. It appears that in the city of Richmond in 1915 city and state taxes at the rates first mentioned were imposed on national bank stocks to the aggregate value of more than $8,000,000 and stocks

of state banks and trust companies to the aggregate value of $6,000,000 and upwards, while taxes at the lower aggregate rate of ninety-five cents per $100—city tax thirty cents, state tax sixty-five cents—were imposed for the same year upon bonds, notes, and other evidences of indebtedness aggregating $6,250,000 in value. The court cited the *Mercantile Bank Case,* the *Amoskeag Savings Bank Case,* and *Evansville Bank v. Britton* (1881), 105 U. S. 322, and, referring to the rule heretofore quoted from the *Mercantile Bank Case,* the court said:

"No decision of this court to which our attention is called has qualified that rule, or construed sec. 5219 as leaving out of consideration the rate of state taxation imposed upon moneyed capital in the hands of individual citizens invested in loans or securities for the payment of money, either for permanent or temporary purposes, where such moneyed capital comes into competition with that of the national banks. . . . In the present case there is a clear showing of such competition, relatively material in amount, and it follows that, upon the undisputed facts, the ordinance and statute under which the stock of plaintiff in error was assessed, as construed and applied, exceeded the limitation prescribed by sec. 5219, Rev. Stats., and hence that the tax is invalid."

There is nothing in the published report to indicate whether the bonds, notes, and other evidences of indebtedness aggregating $6,250,000 are held by private banks or other persons. We find nothing in the laws of the state of Virginia which restricts the business of banking to corporations organized under the laws of that state or of the United States, and it is asserted in the briefs of counsel that there are in fact a number of private banking institutions within the city of Richmond. Nor is there anything in the published report to indicate definitely what is meant by competition. If the rule laid down in the *Aberdeen Bank Case* is adhered to, it must mean something more than the mere fact that citizens of the state are loaning to each other, for

there the allegation of the bill was that $14,000,000 was invested in loans and securities by the citizens of the state of Washington and to them payable and owing by other citizens of said state. The case was even stronger in *Bank of Commerce v. Seattle* (1897), 166 U. S. 463, 17 Sup. Ct. 996, where the allegation held insufficient to show competition was as follows:

"All of said other moneyed capital referred to was all the moneyed capital in the city owned by resident individual citizens and invested in interest-bearing loans, discounts, and securities, except that invested in incorporated banks located in the city."

The word "competition" does not appear in sec. 5219. While the word was not used, the idea was first introduced into the decisions of the court in *People v. Commissioners,* 4 Wall. 244. The dominant idea of Congress in permitting taxation of national banks was that the right of the states should be so restricted that national banks should not be handicapped by the states. Congressional Globe, Part 2, 1st sess. 38th Congress, p. 1873. The word first appeared in this connection in *Mercantile Bank v. New York,* 121 U. S. 138, at p. 155 (7 Sup. Ct. 826), where it is said:

"The main purpose, therefore, of Congress in fixing limits to state taxation on investments in the shares of national banks was to render it impossible for the state, in levying such a tax, to create and foster an unequal and unfriendly *competition,* by favoring institutions or individuals carrying on a similar business and operations and investments of a like character. The language of the act of Congress is to be read in the light of this policy."

The meaning of the words "moneyed capital" was drawn into question in the House when it had under consideration the amendment of the section in 1868. The chairman of the committee on banking and currency said: "My own impression is that they [referring to the words 'moneyed capital'] mean capital invested in similar interests—bank shares of

state institutions as they originally existed." Congressional Globe, Part 1, 2d sess. 40th Congress, 1867–1868, p. 803.

The word "competition" has no definition which is inclusive as well as exclusive. 12 Corp. Jur. 236 and cases cited. As ordinarily used, it is opposed in meaning to monopoly. It involves the idea of struggle between rivals endeavoring to obtain the same thing. As the word is used in the decisions referred to, it undoubtedly means that, if there is any material amount of moneyed capital engaged in a business which bids against national·banks for the business which they are authorized to do, competition exists. *Mercantile Nat. Bank v. Shields,* 59 Fed. 952; *First Nat. Bank v. Turner,* 154 Ind. 456, 57 N. E. 110; *First Nat. Bank v. Christensen,* 39 Utah, 568, 118 Pac. 778.

Therefore, as has been pointed out, shares of stock in railroad companies, mining companies, manufacturing companies, savings banks, building and loan associations, and other corporations, although represented by certificates showing that the owner is entitled to an interest expressed in money value, nevertheless these cannot be said to be in competition with moneyed capital invested in national bank shares. 3 Cooley, Taxation (4th ed.) § 999 and cases cited.

The testimony upon which the trial court concluded that there was moneyed capital in the hands of individual citizens in Wisconsin which came into competition with national banks related principally to loaning concerns and individuals loaning their own funds and may be summarized as follows: Loaning concerns compete with the business of national banks because they withdraw funds from the banks which they use in making their loans. Persons who purchase mortgages, notes, and bonds at times withdraw funds from the banks for that purpose. In order to establish a national bank it is necessary to sell its stock. Somebody has to furnish the money to buy the stock. There is competition, therefore, in two ways: competition for capital and competition for money which would ordinarily be on deposit

with the bank.  If people who have funds to invest, invest them in securities other than bank stock, the bank would be hard pressed to obtain capital on which to operate, and in that sense they are in competition for capital.  We give the language of one witness:

"There is a competition for business between national banks and bonding companies or individuals engaged in selling bonds.  That competition might arise in several ways.  It might arise directly in that national banks are authorized to buy and sell securities or competition would arise in the money which the two institutions would lend. . . . Investment houses dealing in all kinds of securities would come into competition with such loans, especially in short-time loans.  The money that is awaiting investment is largely held by individuals and a large part of it on deposit in national banks.  When that money is invested it is withdrawn from the banks by the depositor to pay the vendor of the bond."

Upon this testimony rests the conclusion of the trial court that there was competition in fact; but this is no more than the competition which exists when manufacturing and commercial corporations seek capital either for the organization of their business or to aid them in carrying it on after its organization.  As has been pointed out, competition of this kind has been repeatedly held not to be competition within the meaning of that term as used in the construction of sec. 5219.  Investors wishing to purchase dry goods, automobiles, *et cetera,* withdraw money from banks, but that does not amount to competition in fact.  There are no concerns or individuals within the state of Wisconsin engaged in enterprises in which the capital employed in carrying on its business is money "where the object of the business is the making of profit by its use as money" except banks.  All such persons, firms, and corporations are required under the laws of the state of Wisconsin to organize as banks.  In this respect the situation in Wisconsin, by reason of its banking laws, is radically different from those in most states,

and one, so far as we are able to discover, not heretofore dealt with. *Minnehaha Nat. Bank v. Anderson* (D. C.) 2 Fed. Rep. (2d) 897, does not deal with this situation.

We come now to a consideration of moneyed capital within the state of Wisconsin which is said to be in competition with the shares of national banking associations within the meaning of sec. 5219.

### *Building and Loan Associations.*

In *Mercantile Nat. Bank v. Hubbard* (1899), 98 Fed. 465, the court said:

"It seems to me that building associations are certainly not to be differentiated in their purpose or object, or practical effect, from savings banks, and that the capital invested in them, though subject to a somewhat different rule of taxation, cannot be regarded as moneyed capital in competition with the moneyed capital in national banks, any more than is capital invested in savings banks. The chief object of building associations is to encourage the building of small houses by poor people, and the saving from their earnings, week by week, of an amount sufficient to pay the mortgage debts incurred in the purchase of the land and the construction of the house."

While this case was reversed on appeal (105 Fed. 809), the reversal was upon an entirely different point. See, also, *Consolidated Nat. Bank v. Pima Co.* 5 Ariz. 142, 48 Pac. 291; *First Nat. Bank v. Dawson Co.* 66 Mont. 321, 213 Pac. 1097; *People ex rel. Broderick v. Goldfogle,* 123 Misc. 399, 205 N. Y. Supp. 870.

### *Brokers and Dealers in Bonds, Mortgages, and Securities.*

These are not in competition with national banks because national banks are not by law authorized to carry on the business of trafficking or dealing in mortgages, bonds, or securities. While they may buy and sell mortgages, bonds, and securities as an incident to their principal business, they are not in any proper sense of the term "dealers" in such

securities. *People ex rel. Broderick v. Goldfogle,* 123 Misc. 399, 205 N. Y. Supp. 870; Morse, Banks & Banking (5th ed.) §§ 59, 71, 77; *National Bank v. Mayor of Baltimore,* 100 Fed. 24 (C. C. A.); *Corn Exchange Nat. Bank v. Kaiser,* 160 Wis. 199, 151 N. W. 259; *First Nat. Bank v. Anderson,* 172 U. S. 573, 19 Sup. Ct. 284.

In *Talbott v. Silver Bow Co.* 139 U. S. 438, 11 Sup. Ct. 594, the court said: "Obviously by this section [sec. 5219] as interpreted by the decisions of this court, the limitation applies solely to a parallel with the individual or corporation whose capital in money is used with a view of compensation for the use of the money." See, also, *Palmer v. McMahon,* 133 U. S. 660, 10 Sup. Ct. 324.

In *Minnehaha Nat. Bank v. Anderson* (D. C.) 2 Fed. Rep. (2d) 897, the restricted power of national banks to act as brokers is wholly ignored. National banks do not use their capital as a "rotating fund" in the purchase and sale of securities.

Dealers in bonds, mortgages, and securities do not derive their profit except in a slight degree from accruing interest. Their objective is a profit by resale at an advanced price. They are merchandisers of securities and not bankers in any proper acceptation of that term. They are not in Wisconsin permitted to use the words "bank," "savings bank," "banker," or the plural thereof, upon any office sign or on any letter-head or other written or printed matter. Sec. 221.49, Stats.

### Acceptance Companies.

The business conducted by these companies, at least in this state, is of comparatively recent origin. Dealers in automobiles, motor trucks, motorcycles, vacuum cleaners, electric washing machines, pianos, talking machines, and other articles make sales on the instalment plan, taking notes or so-called acceptances in the nature of conditional-sales contracts. Acceptance companies buy these contracts, and in the transaction of their business are usually heavy borrowers

from the banks.   Their business more nearly corresponds to that of a pawnbroker or a chattel-mortgage broker than of a bank.

In *People ex rel. Broderick v. Goldfogle,* 123 Misc. 399, 205 N. Y. Supp. 870, the court said:

"Bankers' Commercial Securities Co., Inc., purchases from dealers, who buy from manufacturers conditional-sale contracts, leases, and chattel mortgages on automatic piano players, calling for weekly or monthly instalments over an average period of thirty months; the payments average about $12.50 a month on each transaction.   This is not the acquisition of evidences of indebtedness, which 'normally enter into the business of banking.'" Citing *Merchants' Nat. Bank v. Richmond,* 256 U. S. 635, 639, 41 Sup. Ct. 619.

The very fact that these companies have come into existence to meet a situation created by the increasing amount of sales made upon conditional-sales contracts not acceptable to banks is indicative of the fact that they are doing a business not in competition with that done by banks.   There is a wide gap between securities of this character and the ordinary commercial paper accepted by banks in the usual course of their business.

### Dealers in Foreign Exchange.

Inasmuch as the only showing of competition in this field is that done by the express companies, which are under the laws of the state a public utility and therefore assessable on an *ad valorem* basis, we shall not further consider this subject, it not being made to appear in any way that the moneyed capital invested in these companies is assessed at a lower rate than the shares in national banking associations are assessed.

### Investments of Individuals in Bonds, Mortgages, and Securities.

It appears from the evidence and is a fact known to every one that in the state of Wisconsin there are many individ-

uals who loan their own money upon real-estate mortgages, bonds, and other interest-bearing securities in lieu of depositing the same in banks or investing in stocks or other forms of investment. Investments thus made by individuals can at best come into competition with the business done by national banks only in a limited and remote way. Banks deal principally in commercial paper and can take real-estate loans of but a very limited class. By sec. 24 of the Federal Reserve Act, national banks are authorized to make loans within a radius of one hundred miles upon farms for not more than five years; upon other real estate for not more than one year at not exceeding fifty per cent. of the actual value of the property offered as security, the aggregate of which loans cannot exceed twenty-five per cent. of the capital and surplus or one third of the time deposits of the bank, whichever is greater. No person can accept deposits or do anything approaching a banking business under the law of this state. Loans made by individuals upon real estate or investments made by them in bonds are in no practical way, to any extent, in competition with the business of national banks. Individual investors handle a very large class of loans which national banks are by law forbidden to deal in.

In the *Mercantile Bank Case* it was held that investments in municipal securities are not in competition with national banking associations. The court said:

"Such securities undoubtedly represent moneyed capital, but as from their nature they are not ordinarily the subjects of taxation they are not within the reason of the rule established by Congress for the taxation of national bank shares."

We cannot believe that these incidental investments made from the savings of individual citizens come within the term "moneyed capital" in competition with similar capital invested in the shares of national banking associations however large in the aggregate amount they may be. While they more closely approximate competitive moneyed capital than

any other form of moneyed capital in this state, they are not made as a business but simply as one form of investment. If a deposit in a savings bank is not competitive moneyed capital, how does it become competitive when it is drawn out and invested in a mortgage? This situation was, however, presented and ruled upon in the *Bank of Aberdeen Case,* where it appeared that there were millions of dollars loaned by citizens in the state to other citizens upon notes, bonds, and mortgages, but that fact was held not to be sufficient to show competition. No more is shown in this case. In that case as here the money was no doubt withdrawn from banks for the purpose of investment, and after its investment no doubt found its way immediately back into the banks. Transactions of that sort are not employing moneyed capital in a business, nor is it the kind of competition which must result in the classification of capital thus held with moneyed capital invested in national bank shares. Such inequality as may exist under our taxing law is accidental and not an intentional or a systematic discrimination. *First Nat. Bank v. Albright,* 208 U. S. 548, 552, 28 Sup. Ct. 349.

Our conclusion in this respect is strengthened by the language of the act of March 4, 1923. It is there provided that "bonds, notes, or other evidence of indebtedness in the hands of individual citizens not employed or engaged in the banking or investment business and representing merely personal investments not made in competition with such business, shall not be deemed moneyed capital within the meaning of this section."

If the investments of individuals made not as a business but for the purpose of investing their own funds are held to be competitive within the meaning of sec. 5219 before the amendment, they must fall in the same category thereafter, for by the amendment they must "not be made in competition with such business." Without attempting to define what is meant by competition, the word was no doubt used by Congress in the act of 1923 in the same sense in which it

was used in the *Mercantile Bank Case* and *Merchants' Nat. Bank v. Richmond Case.* Congress must have meant to do something by the amendment. If the term "competition" is defined as plaintiffs claim it should be, the amendment would be futile as applied to the situation existing in this state.

It is considered upon the whole case, therefore, that the tax assessed and levied was a legal tax and that the law of the state of Wisconsin authorizing it is a valid law and within the consent conferred by sec. 5219, Revised Statutes of the United States, upon the state of Wisconsin, for the following reasons:

(a) There is in fact no unfriendly discrimination or hostile attitude on the part of the state of Wisconsin toward national banks.

(b) The law is not in fact discriminatory, does not in fact operate oppressively or harmfully, as is shown by the fact that national banks are prosperous.

(c) All persons, firms, and corporations doing a banking business are required to organize as banks and so become taxable as national banks are taxed. There is no business conducted within the state which is in direct competition with national banks not taxed as national banks are taxed.

(d) Moneyed capital in the hands of individual citizens, invested in mortgages and securities for their own personal benefit, does not in fact compete as a business with moneyed capital invested in shares of national banks for the business which national banks are authorized to do. If there is any competition as to loans, such competition is within such a narrow and restricted field and so inconsequential in amount as not to be in fact discriminatory within the decisions already cited.

(e) The *Mercantile Bank v. New York Case, supra,* is not overruled or modified by *Merchants' Nat. Bank v. Richmond, supra,* but is reaffirmed by it so far as the construction of sec. 5219 is concerned. The fact that moneyed capital in the hands of individual citizens came in competi-

tion with national banks was established in that case without dispute and the rule laid down in the *Mercantile Bank v. New York Case* was applied. That fact does not appear in this case.

(f) There is no moneyed capital in the hands of individual citizens of Wisconsin bidding for the business which national banks are authorized to do. Such restricted and incidental competition as there is, is insignificant in amount and works no "discrimination unfavorable to the holders of shares of the national banks."

*By the Court.*—Judgment appealed from is reversed, and cause remanded with directions to the trial court to enter judgment in favor of the defendant dismissing the plaintiff's complaint.

The following opinion was filed April 13, 1925:

VINJE, C. J. (*dissenting*). The court states that the crucial question raised upon this appeal is as follows: "Are the shares of stock in national banking associations within the state of Wisconsin assessed at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such state?" This seems to me to be a misconception of the principal question in the case, for it is a conceded fact that the bank stock in question was assessed at over three per cent., while had it been assessed as other moneyed capital in the hands of private individuals of the state, namely, upon an income basis or an equivalent thereof, the assessment would have been less than one per cent. Indeed, it was frankly conceded upon the oral argument by the State, as intervener, and by the city of *Hartford* that the bank stock was assessed at a much higher rate than was moneyed capital in the hands of private individuals of the state and that the rate was discriminatory if it came within the prohibition of the statute as construed by the federal supreme court. The justification sought upon the argument,

and the justification sought by the opinion of the court, is that there is in the state of Wisconsin outside of state banks and trust companies, which are assessed at the same rate as national banks, no moneyed capital in the hands of private individuals that comes in competition with the business of national banks. This is the basic ground for the conclusion reached by the court. Further on in the opinion it is stated: "There are no concerns or individuals within the state of Wisconsin engaged in enterprises in which the capital employed in carrying on its business is money 'where the object of the business is the making of profit by its use as money' except banks." It seems to me that trust companies might well have been included in the exception inasmuch as they are taxed the same as banks and perform to a large extent the function of banks, and for my purpose I shall assume that trust companies were intended to be included in the exception. My difficulty comes not so much in construing the federal decisions as the court construes them, but in arriving at the conclusion upon the evidence in this case, and upon what may be taken judicial notice of, that there is no moneyed capital in the hands of private individuals in the state of Wisconsin that comes in competition with the business of national banks. The undisputed evidence in the case shows that there is such competition so far as the plaintiff bank is concerned. The taxing officer and the State introduced no evidence to rebut that which the bank offered, so that the testimony in the case is undisputed except in so far as it may be in conflict with facts of which the court may take judicial notice. Mr. Liver, the president of the bank, who had been such for seventeen years past, testified among other things that there were four business concerns in the city of *Hartford* engaged in the loaning business and that he knew that these four concerns had loaned out about $250,000 or $300,000 a year, and that such facts were true as to the year 1921. He further testified that these loaning concerns "compete with the business of the bank in that

respect the same as other banks would be in competition."
He further states, in answer to a question as to whether
the same conditions obtain generally throughout the state,
that, judging from his experience and connection with five
groups of Wisconsin bankers associations, "the situation is
the same.  The amounts in some localities are very large, of
course.  The effect is the same all over.  I am familiar with
the banking business and I have attended a great many bank-
ers' conventions.  I know the Ziegler Company.  Its home
office is at West Bend.  It is engaged in the real estate and
loan business.  It does a large amount of business in this
city.  It has an agency at *Hartford.*  They circularize their
loans and solicit in many ways.  I know of large loans
they have made that run up into thousands of dollars, and
the situation I testified to competed with the business of the
*First National Bank* applied in 1921 as well as it does at
the present time.  There is no change in the situation."  I
agree with the statement of the court that it "is required to
take judicial notice of the general conditions to which the
law applies.  It is either valid *in toto* or void *in toto.*  Its
validity cannot be made dependent upon a particular find-
ing of fact relating to the conditions in a single locality so
that, assuming it to be administered as written, the law might
be held valid in one place and void in another or valid at
one time and void at another."  The difficulty I have is in
disregarding the testimony in the case as applied to the
particular locality of *Hartford,* a city containing a little
more than four thousand inhabitants, and in coming to the
conclusion that the testimony given with reference to the
conditions in that locality do not obtain in other cities in
the state containing an equal or larger population.  It seems
to me that the uncontradicted testimony of the president of
the plaintiff bank that there are a number of loan companies
in the city of *Hartford* that come in direct competition with
the loaning business of the *First National Bank* is in ac-
cordance with facts generally known to exist in the banking

First Nat. Bank v. Hartford, 187 Wis. 290.     Dissent.

and loaning business, and that it is quite probable, as he says, that the condition existing in his locality obtains throughout the state. Indeed, it may be safely said that in larger cities the amount of money loaned by loaning companies in all probability exceeds the amount per capita in the smaller cities. We have one city containing nearly one half million inhabitants in which there is an immense amount of wealth and in which a large number of loaning companies are doing a profitable business. We have in the state of Wisconsin and did have in 1921 over fifty cities containing a population of more than four thousand people each and in the aggregate a population exceeding one million and a quarter. If we take this condition into account and assume that an equal amount of money is loaned in these urban localities, omitting altogether suburban and agricultural districts, we find that over ninety million dollars in loans would be made in these urban localities throughout the year. Inasmuch as it is a fact that in the state of Wisconsin at least seventy-five per cent. of the net income of national banks is obtained from loans, it seems natural to conclude that the vast amount of loans made by these loaning companies comes in sharp competition with the main gainful business of national banks in this state. The conclusion reached by the court is that outside of state banks and trust companies there is no moneyed capital in the hands of private individuals that comes into competition with the business of national banks. It is conceded that there must be a substantial competition to some substantial part of the bank's business; that the federal statute was not intended to make a law invalid where it merely in some minor degree in a minor way may be discriminatory. It is also conceded that the law be construed, prior to its amendment by Congress in 1923, as it was then amended, namely, that this competition must come through some regular permanent business channel and not through individual loans made by individual citizens for their own benefit only, although from some expressions in the decision

of the supreme court of the United States it may be doubtful that the act prior to its amendment should be so construed. As I interpret the situation, the court has come to the conclusion that there is no moneyed capital in the hands of private individuals in this state that comes in substantial competition with a substantial part of a national bank's business because in a number of federal cases the evidence showed that as to a particular locality a particular class of moneyed capital in the hands of private individuals was found not to come in competition with the business of a national bank. It is one thing to say that as to a particular locality this class or that class or several classes of moneyed capital in the hands of private individuals did not come into competition with a national bank situated in that locality. It is quite another thing to come to the conclusion that national banks in the state of Wisconsin have no competition from all classes of moneyed capital in the hands of private individuals within the whole state. Herein lies my disagreement with the result of the court. We all, I think, construe the federal decisions alike. But I am unable to reach the conclusion that under the federal decision the evidence in this case, together with the facts of which we may take judicial notice, can sustain the conclusion that there is no competitive moneyed capital in the hands of private individuals in the state of Wisconsin.

It seems to me quite plain that Congress, when using the term "other moneyed capital in the hands of private individuals," meant something besides money in state or private banks or trust companies. If those were the only classes of capital Congress had reference to, it would have been easy to have so stated in the law, especially in the amendment of 1923. But we find there the identical phraseology retained, and it seems to me that from that fact it cannot be said that Congress was of the view that in any one state such as Wisconsin no other moneyed capital in the hands of private individuals could or did come in competition with national

banks except state banks, trust companies, or private banks. I cannot escape the conclusion that by using the phrase "other moneyed capital in the hands of private individuals" it was intended to include all forms of moneyed capital where money as such was used as capital for the purpose of making a gain or profit, and that whenever a business of that kind, conducted by an individual or by a partnership, or otherwise, came in direct competition with a substantial part of the business of a national bank it was included in the condemnation of the statute. Where, as here, our law taxes loaning companies less than one third of what it taxes national banks for doing the same kind of business, it seems to me that it must be said that the law is discriminatory and comes within the condemnation of the federal statute. It is idle to say that national banks have prospered in the past under our system of taxation. That is not the question. The question is, Does our system of taxation operate to discriminate against national banks as compared with other moneyed capital engaged in the same or like business? Of course it goes without saying that private individuals in our state cannot engage in all the kinds of business that a national bank engages in, because private individuals in our state cannot do a private banking business without being organized as state banks and thus coming within the same class as to taxation. But as was said in *Mercantile Bank v. New York,* 121 U. S. 138, 7 Sup. Ct. 826, a part of the legitimate business of a national bank is "the discounting of commercial paper, making loans of money on collateral security, and negotiating loans, dealing in bonds," etc. Now it is a well known fact that in our state there are numerous private individuals and partnerships and corporations that can and do engage in this class of business just mentioned which is a part of the business of a national bank, and the money invested in such enterprises runs into the millions of dollars and the business transacted by them runs into the hundreds of millions of dollars annually.

The crux in this case is whether or not there is moneyed capital in the hands of private individuals of this state that comes in competition with the business of national banks or any substantial part thereof within the meaning of the federal statute as construed by the supreme court of the United States.   The case of *Merchants' Nat. Bank v. Richmond,* 256 U. S. 635, 41 Sup. Ct. 619, is the latest expression we have upon this question from the federal supreme court. In that case it was found that there was money to the extent of upwards of twenty million dollars coming into competition with the business of national banks, and, as the court said:

"By repeated decisions of this court, dealing with the restriction here imposed, it has become established that while the words 'moneyed capital in the hands of individual citizens' do not include shares of stock in corporations that do not enter into competition with the national banks, they do include something besides shares in bank corporations and others that enter into direct competition with those banks. They include not only moneys invested in private banking, properly so called, but investments of individuals in securities that represent money at interest and other evidences of indebtedness such as normally enter into the business of banking."

And further on it is said that this "moneyed capital" "includes money in the hands of individuals employed in a similar way, invested in loans or in securities for the payment of money, either as an investment of a permanent character or temporarily with a view to sale or repayment and reinvestment.   In this way the moneyed capital in the hands of individuals is distinguished from what is known generally as personal property."   It would seem to be clear from this expression of opinion that it was the idea of the federal supreme court that the competitive moneyed capital spoken of in the statute was not limited to the competitive moneyed capital of a bank or even of a trust company, but that it might be competitive though in the hands of private

individuals and though doing only a part of the business which a national bank transacts.

My conclusion is that not only does the undisputed testimony show that there was moneyed capital in the hands of private individuals in large amounts coming in direct competition with the loaning business of the plaintiff bank, but that in my judgment, taking into account the business of national banks within the state as transacted and the business of loaning and bonding companies and other private businesses in which money is used as capital for the purpose of making a profit thereon, it can be said that there are hundreds of millions of dollars in this state that come in direct competition with some form of the business transacted by national banks, and therefore it is contrary to the federal statute to tax the national banks over three times as much as these other private businesses are taxed. For the reasons stated I am unable to concur in the view of the majority of the court, and in my opinion the judgment of the trial court should have been affirmed.

I am authorized to state that Mr. Justice ESCHWEILER and Mr. Justice JONES concur in this dissenting opinion.

A motion for a rehearing was denied, with $25 costs, on June 22, 1925.